WARD BAKING COMPANY and Others, Appellants, *v.* WESTERN UNION TELEGRAPH COMPANY and Another, Defendants, Impleaded with CARL SHERMAN, Individually, and as Attorney-General, and Others, Respondents.

Third Department, June 19, 1923.

Attorney-General — action to restrain telegraph companies from delivering copies of telegrams to Attorney-General — Attorney-General was directed by Governor to investigate killing of particular individual by one of plaintiffs — Executive Law, § 62, subd. 8, does not authorize investigation of specific crime — said act was war measure — if statute authorizes investigation of specific crime it is unconstitutional — said investigation was not instituted to inform Governor of fitness of district attorney in county where crime was committed — injunction granted.

In an action to restrain telegraph companies from delivering to the Attorney-General copies of telegrams which were sent or received by the plaintiffs, it appeared that the Governor, acting under subdivision 8 of section 62 of the

Executive Law, directed the Attorney-General " to inquire into the circumstances surrounding the death of one Clarence E. Peters " who was found dead in Westchester county; that prior to the investigation one of the plaintiffs made a statement through his counsel that he killed Peters in self-defense; that said plaintiff was subsequently indicted and the indictment dismissed for lack of prosecution; that the entire investigation by the Attorney-General was directed and conducted with the sole purpose in view of obtaining proof that said plaintiff killed Peters without justification and with malice aforethought.

*Held,* that subdivision 8 of section 62 of the Executive Law does not authorize the Attorney-General to investigate a specific crime for the purpose of ascertaining whether a particular individual committed that crime, and under such circumstances the matters involved upon the inquiry do not affect the " public peace, public safety and public justice," within the meaning of the statute, and said investigation was not, therefore, sanctioned by the statute.

If it was the intention of the Legislature to authorize the Attorney-General to conduct an investigation of this sort, the act is unconstitutional as conferring judicial powers upon the Attorney-General, since it gives him power to subpœna witnesses and to examine them.

The investigation cannot be upheld on the ground that it was instituted for the purpose of furnishing the Governor of the State with information so that he might properly be advised whether he should use his executive power to supersede the district attorney of the county where the crime was committed, since there is no proof that the district attorney had failed in his duty, but on the contrary at the time the Governor directed the Attorney-General to proceed, the district attorney had been commended by the justices of the Supreme Court before whom the criminal proceedings or some phase thereof came. And furthermore, the communication by the Governor to the Attorney-General discloses nothing which indicates either that he considered the district attorney had failed in his duty or that he desired information to govern executive action on his part.

Accordingly, an injunction should be granted restraining the telegraph companies from delivering copies of telegrams to the Attorney-General.

APPEAL by the plaintiffs, Ward Baking Company and others, from an order of the Supreme Court, made at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 26th day of April, 1923, denying plaintiffs' motion for a temporary injunction.

*Rabenold & Scribner* [*Isaac N. Mills* and *Allan R. Campbell* of counsel], for the appellants.

*Carl Sherman, Attorney-General* [*Wilber W. Chambers, Deputy Attorney-General,* of counsel], for the respondents.

H. T. KELLOGG, Acting P. J.:

The Executive Law contains the following provisions: " Whenever in his judgment the public interest requires it, the Attorney-General may, with the approval of the Governor, and when directed by the Governor, shall, inquire into matters concerning the public peace, public safety and public justice. * * * The Attorney-General, his deputy, or other officer designated by him, is

empowered to subpœna witnesses, compel their attendance, examine them under oath before himself or a magistrate and require the production of any books or papers which he deems relevant or material to the inquiry." (§ 62, subd. 8.) The Governor of the State, intending to exert the power thus conferred upon him, on March 27, 1923, made in writing the following communication to the Attorney-General: " Pursuant to the provisions of section 62 of the Executive Law, and because in my judgment the public interest requires it, I ask you to inquire into the circumstances surrounding the death of one Clarence E. Peters, who was found dead on or about the sixteenth day of May, 1922, at the north end of Kensico Lake near the Whippoorwill Road on the Chappaqua Road, Westchester County, and for such purpose you are authorized to make use of any funds which have been provided by the Legislature therefor."

The facts known, and the proceedings which had been taken in relation to the death of Clarence Peters, at the time when the Governor made his communication to the Attorney-General, were as follows: On May 16, 1922, the body of a dead man was discovered by the authorities at the place named in the communication. The apparent cause of death was a gunshot wound. On May seventeenth the body was identified as the body of Clarence Peters. On May nineteenth the authorities were still without information as to the identity of the person who had killed Peters. On that day counsel for Walter S. Ward, one of the plaintiffs herein, informed the authorities that his client had shot and killed him. On May 22, 1922, Ward was surrendered to the authorities by his counsel. At this time counsel made a written statement setting forth the facts in relation to the homicide. It appeared therefrom that Clarence Peters was one of a gang of three men who had attempted to blackmail Ward; that these men sought to extort money from Ward by various threats including that of the death of himself and family; that they finally demanded the payment of the sum of $75,000; that Ward agreed to meet the men on the night of May fifteenth to talk matters over; that they met at the place appointed; that Ward was in an automobile from which Peters, while covering him with a revolver, directed him to descend; that Ward made a grab for the revolver held by Peters and thereby diverted the shot which Peters fired; that Ward returned the fire, thereby killing Peters; that the remainder of the gang immediately fled and the body of Peters was left by the roadside. On June fifteenth the grand jury of the county of Westchester returned an indictment for murder in the first degree against Ward for the killing of Clarence Peters. On July eleventh

Ward moved for the dismissal of the indictment on the ground that there was no evidence to support it. The court denied the motion but admitted Ward to bail. It then stated that the only evidence connecting Ward with the homicide was the written statement made upon his behalf by his counsel. It expressed the view that the district attorney of the county had prosecuted the case with great care and that his actions had been governed by motives which were entirely proper. Thereafter counsel for Ward on various occasions vainly made diligent effort to bring the indictment to trial. Finally, on January 2, 1923, upon a motion made to that end, the court dismissed the indictment for lack of prosecution. The court, among other things, then stated that the district attorney, acting with diligence, had been unable to overcome the written statement made by counsel for the defendant. It aptly said: " The defendant is not obliged to prove his innocence. The People must prove his guilt. The killing of a man in self-defense is not a crime. That is the only admission that was made by the defendant or with his authority." In effect the court ruled, and with much reason, that there was no evidence that the homicide committed by Ward was a crime. Thereafter the matter appears to have rested in abeyance until the Governor made his communication to the Attorney-General.

The Attorney-General, pursuant to the communication made to him by the Governor, instituted the investigation thereby directed to be made. He designated one of his deputies to act on his behalf and directed him to take whatever steps he might deem necessary. Various hearings were conducted by this deputy. Witnesses were subpoenaed to appear before him and were examined. The purpose of the examinations was to establish that Walter Ward, without justification, killed Clarence Peters. It appeared from the proof that Ralph D. Ward, the brother of Walter Ward, had at one time cabled his father asking authority to give Walter a large sum of money; that the father wired back instructions to give Walter the money; that he later wired Ralph directing that no money be paid if it were required as blackmail; that this change in instructions had resulted from a cable sent by Walter to the father; that Walter had refused to tell Ralph whether the money was wanted for blackmail; that Ralph in consequence did not pay over the money. Thereupon officers of the Western Union Telegraph Company, defendant herein, were subpoenaed to deliver up the cablegrams which had been sent through the offices of the company by Ralph Ward or Walter Ward to their father or by their father to either of them. This action was thereafter brought by Walter S. Ward with whom Ralph D. Ward, his brother, and

the Ward Baking Company were joined, to restrain the delivery of the cablegrams by the defendant telegraph company in obedience to the subpœnas served upon it. The Ward Baking Company was joined because of the interest which it might have in cablegrams exchanged between the Wards who were officers of that company. The Postal Telegraph and Cable Company was joined as defendant and similar relief was demanded against it in reference to other cablegrams between the Wards sent through its offices. The theory of the action is that the plaintiffs have a property right in the cablegrams; that the Attorney-General was without jurisdiction to conduct the investigation in question; that the defendant telegraph companies would, therefore, not be justified by the subpœnas served or threatened to be served in making delivery of the telegrams as directed. The plaintiffs applied for a temporary injunction which was refused, and from the order denying the application for an injunction this appeal was taken.

The purpose animating the Governor in directing the investigation to be made, and the objects sought to be advanced by the Attorney-General in making it, are controlling upon the jurisdictional question whether or not the proceedings had legal sanction. The information possessed by the Governor was exclusively to the effect that Walter Ward had killed Clarence Peters. He must have been advised that Ward had admitted the killing; that he had asserted that it was done in self-defense; that Ward had been indicted; that the indictment had been dismissed; that no evidence had been forthcoming that the homicide committed by Ward was criminal. He could not have been advised that any person other than Ward killed Peters. The investigation which followed was directed to the single end of breaking down Ward's claim that the homicide was justifiable. The Attorney-General has never advanced the theory, and does not advance it now, that the homicide was committed by a person other than Ward, or that proof to that effect exists or may be obtained. The contention that the investigation was general in character, therefore, fails (*Matter of Both,* 200 App. Div. 423; *People ex rel. Travis* v. *Knott,* 204 id. 379), and we must conclude that it was directed and conducted with the sole purpose in view of obtaining proof that the individual Ward killed the individual Peters with malice aforethought.

We do not think that the provisions of subdivision 8 of section 62 of the Executive Law, which are relied upon by the Attorney-General and which we have quoted, were designed to give sanction to an investigation of this character. The law in this State, as in other jurisdictions which boast of the great heritage of the English common law, protects accused persons not alone against

ill-founded prosecutions threatening the loss of life or liberty, but against injuries to reputation which might result from making public the testimony given in preliminary criminal examinations. It has surrounded them with many safeguards. No man may be held to answer for a capital or infamous crime unless upon presentment of a grand jury. (Const. art. 1, § 6.) The grand jury can receive none but legal evidence. (Code Crim. Proc. § 256.) No person shall be compelled in any criminal case to be a witness against himself. (Const. art. 1, § 6.) The members of the grand jury must take an oath that they will keep secret the counsel of the people, of their own and of their fellows. (Code Crim. Proc. § 245.) No person may be admitted to the presence of a grand jury except the district attorney of the county, his assistant, a witness and the stenographer who keeps the minutes. (Code Crim. Proc. §§ 264, 952-p.) The secrets of the grand jury must be kept. (Code Crim. Proc. § 265.) It may not reveal the testimony of any witness except by order of the court to determine its consistency with testimony subsequently given by him, or to determine whether he committed perjury. (Code Crim. Proc. § 266.) " Grand jurors are sworn to secrecy, and, as a general rule, what takes place before them is privileged from disclosure. The clerk of the grand jury cannot be compelled to reveal the proceedings before them; * * * nor can the county attorney." (Per BRONSON, Ch. J., *People* v. *Hulbut,* 4 Den. 135.) The proceedings before a grand jury constitute the only general criminal investigation known to the law. (*Matter of Both; People ex rel. Travis* v. *Knott, supra; People ex rel. Sandman* v. *Tuthill,* 79 App. Div. 24; *People ex rel. Sampson* v. *Dunning,* 113 id. 35.) " No such power of inquisition is given to a magistrate. To the grand jury, and to it alone, is given the power of investigation without a definite charge. The secrecy of the grand jury prevents injury to reputations from roving investigations." (Per BLACKMAR, P. J., *Matter of Both, supra.*) " The grand jury is the great bulwark of the innocent; it is designed to prevent criminal proceedings in cases where there is lack of probable cause, and this is to be determined *in secret* by responsible men chosen from the community at large, acting upon their oath and upon sworn testimony, and it is hardly to be supposed that the Legislature has intended to open the doors to irresponsible inquisitors who merely alleged generally that fictitious persons have been guilty of crime." (Per WOODWARD, J., in *People ex rel. Sampson* v. *Dunning, supra.*) Even in magistrates' examinations an accused person is carefully safeguarded. He must be advised of his right to the aid of counsel. (Code Crim. Proc. § 188.) He must be given a reasonable time to send for counsel. (Id. § 189.) He must be

informed of his right to make a statement; that he is at liberty to waive the right; that his waiver cannot be used against him. (Id. § 196.) The depositions taken must be kept secret. (Id. § 205.) The accused may avoid the examination by waiving it and giving bail. (Id. § 190.) The provisions of the Executive Law relied upon here do not in terms invest an accused person with these rights or provide these safeguards. They do not protect an accused person against self-incrimination or hearsay evidence. They do not give him the right of representation by counsel or the right to make a statement. They do not provide that statements made by him shall not be used against him. They do not provide for that secrecy of investigation which will protect his fair name. Indeed, throughout the investigation under consideration the Attorney-General has at all times insisted that Ward was without rights or privileges whatsoever. He has made a record against him of other than legal evidence. He secured the opinions of State troopers and deputy sheriffs as to the truth of Ward's statement. He inquired of a newspaper reporter concerning rumors heard by him, and asked him to tell what, as a newspaper man, he regarded as important. He sought to learn whether Ward was a drinking man; whether he ever had women in his car other than his wife; whether he had sponged on his brother in the matter of obtaining loans; whether he had invested police pension funds in the stock of the Ward Baking Company; whether he attempted to corrupt the foreman of the grand jury which indicted him; whether his stock-holdings in the Ward Baking Company were large or small. He tried to compel counsel for Ward to reveal confidential communications between himself and his client. He threateningly directed the attention of counsel to the fact that his refusal to answer was a misdemeanor. He not only failed to protect Ward from notoriety but made public announcement that his investigation would be conducted in the open. It is unthinkable that the Legislature, when it enacted the provisions of subdivision 8 of section 62 of the Executive Law, intended to provide for a criminal investigation against a particular individual in reference to which that individual would be stripped of all the privileges and safeguards which otherwise would be accorded him.

The subdivision in question was added to section 62 by chapter 595 of the Laws of 1917. That act became a law in May, 1917, within one month of the time when the United States entered the World War. It is a matter of common knowledge that at this time the State and nation required protection against the destructive plans and acts of alien enemies resident here as well as against the acts of its own disloyal citizens. There can be no reasonable

doubt that the law thus enacted was fundamentally a war measure; that it was primarily designed to supply proof to the Governor of enemy activities within the borders of the State in order that by the exercise of his executive power he might suppress them. It is for this reason, it seems to us, that the investigations thereby sanctioned were limited to "matters concerning the public peace, public safety and public justice." The law was designed to *avert* rather than to *punish* subversive acts. It cannot be supposed that it was intended to invest the Attorney-General with the power and duty to conduct an investigation, wherever and whenever in any county of the State a crime had, in peace times, been committed by an individual. It cannot be supposed that the Legislature intended to sanction investigations which would so completely revolutionize our criminal procedure and transfer to the Attorney-General of the State powers now resident in the district attorneys of the counties and in the local magistrates. We think that the matters involved upon this inquiry did not affect the "public peace, public safety and public justice" within the meaning of the statute. For this reason we hold that the investigation was not sanctioned by the statute.

We think also that, if the Legislature did intend, when it added subdivision 8 to section 62 of the Executive Law, to authorize a criminal investigation against an individual, such as has been directed and conducted in this instance, it acted without authority in law. In the leading case of *People ex rel. McDonald* v. *Keeler* (99 N. Y. 463) the question arose whether a committee of the Legislature, authorized by that body to conduct an investigation in reference to the affairs of the department of public works in the city of New York, could lawfully subpœna witnesses to attend before it, and, in the case of the non-attendance of a witness or of his refusal to answer, could lawfully exercise the power of punishing him for contempt. It was there stated by the court that although the Constitution of the State of New York did not in terms, as did the Constitution of the United States, divide the powers of the government into separate classes, it was; nevertheless, "a recognized principle that in the division of power among the great departments of government, the judicial power has been committed to the judiciary, as the executive power has been committed to the executive department, and the legislative to the Legislature, and that body has no power to assume the functions of the judiciary to determine controversies among citizens, or even to expound its own laws so as to control the decisions of the courts in respect to past transactions." It was held that the Legislature might, nevertheless, exercise powers of a judicial

character, but only in cases where the exercise of such power was a necessary preliminary in order to enable the Legislature to perform its constitutional functions of passing legislation.   The court, writing through RAPALLO, J., said of this power: " It is a limited power and should be kept within its proper bounds; and, when these are exceeded, a jurisdictional question is presented which is cognizable in the courts." The following was quoted with approval from the opinion of JOHNSON, J., in *Wilckens* v. *Willet* (1 Keyes, 521): " It is a necessary incident to the sovereign power of making laws, and its exercise is often indispensable to the great end of enlightened, judicious and wholesome legislation. The power [of the Legislature to compel the attendance of witnesses] is rather judicial in its nature, but in a legislative body exists as an auxiliary to the legislative power only." It was held in the principal case that the legislative committee had the power claimed by it for the reason that the purpose of the information sought to be obtained was to advise legislative action.   In *Matter of Davies* (168 N. Y. 89) the court writing through VANN, J., said: " Free government consists of three departments, each with distinct and independent powers, designed to operate as a check upon those of the other two co-ordinate branches.   The legislative department makes the laws, while the executive executes and the judiciary construes and applies them.   Each department is confined to its own functions and can neither encroach upon nor be made subordinate to those of another without violating the fundamental principle of a republican form of government." In *Matter of Union Bank, No. 2* (147 App. Div. 593) the question was whether the State Superintendent of Banks, who had taken possession of a bank, was invested by constitutional legislation with the power of subpœnaing an officer of the bank and compelling him to give evidence concerning the conduct of its affairs.   The decision was in favor of the existence of the power.   Mr. Justice WOODWARD dissented, and made the assertion that " neither legislative bodies nor administrative officers can be invested with judicial functions beyond those expressly provided for by the Constitution, or to cases where the power is necessarily implied from those constitutional or statutory functions and duties to the proper performance of which it is essential," and that as the Legislature could not assume judicial functions it necessarily followed " that the Legislature cannot create an officer of the State and invest him with judicial powers beyond those which are necessary in the performance of the duties prescribed for him by law." The decision in the case was reversed in the Court of Appeals where the views given by Mr. Justice WOODWARD were expressly approved.   (204

N. Y. 313.) Judge HAIGHT wrote an opinion in which he said: "Such questions are reserved for the judicial branch of the government, and magistrates, grand juries and district attorneys are provided for the purpose of the investigation and determination of criminal complaints. If, therefore, false reports were made to the banking department it should be investigated through the judicial branch of the government which has jurisdiction over such matters." The Constitution of the State provides for a Supreme Court "with general jurisdiction in law and equity;" for Appellate Divisions of that court with the jurisdiction formerly exercised by its General Terms; for a Court of Appeals with jurisdiction to review decisions upon questions of law; for County Courts with jurisdiction as formerly exercised subject to enlargement or diminishment by the Legislature within certain limits; for Surrogates' Courts with jurisdiction as exercised until otherwise provided by the Legislature. (Const. art. 6, §§ 1, 2, 7, 9, 14, 15.) It provides for the election of justices of the peace by the electors of the towns in such number and with such classification as may be determined by law; for the election of District Court justices in cities with powers to be prescribed by law. It ordains that "all other judicial officers in cities, whose election or appointment is not otherwise provided for in this article, shall be chosen by the electors of such cities, or appointed by some local authorities thereof." (Const. art. 6, § 17.) It provides in section 18 of article 6: "Inferior local courts of civil and criminal jurisdiction may be established by the Legislature, but no inferior local court hereafter created shall be a court of record. * * * Except as herein otherwise provided, all judicial officers shall be elected or appointed at such times and in such manner as the Legislature may direct." The power given to the Legislature by this section to create courts is limited to the creation of *local* courts with *local* jurisdiction only. (*Brandon* v. *Avery*, 22 N. Y. 469; *Hoag* v. *Lamont*, 60 id. 96; *Baird* v. *Helfer*, 12 App. Div. 23.) Thus the whole judicial power of the State is conferred and distributed by the Constitution itself except that it has extended to the Legislature the limited power of providing for the creation of local courts with local jurisdiction. That the Legislature has no power to create courts or bestow jurisdiction which is primarily judicial except as that power is expressed in the Constitution was held in *People ex rel. MacDonald* v. *Leubischer* (34 App. Div. 577). It was said therein by INGRAHAM, J., "that the Legislature has no power to vest in other bodies or departments of the government judicial powers or to authorize such other departments or officers of the government to issue process which shall be due process of law." It is clear that the Constitution

bestows no judicial power on the Governor or Attorney-General. It is equally clear that the Legislature is not given the power, and cannot exercise a power, to confer such jurisdiction upon them. To this latter proposition there may be the one exception that the Legislature can confer the power of conducting judicial investigations for the sole purpose of securing information to advise executive action. That the law under consideration does attempt to confer judicial power is self-evident. It bestows upon the Attorney-General the power of summoning witnesses. " The very power to summon witnesses and to compel them to give evidence is a judicial function." (Per WOODWARD, J., in *Matter of Union Bank, supra.*) It gives the Attorney-General the power " to * * * compel their attendance " and " examine them under oath before himself or a magistrate." If a witness fails to attend or refuses to answer when directed by the Attorney-General he is made guilty of a misdemeanor. The punishment of a witness for failure to obey an order or answer a question of any officer other than one possessing judicial authority would certainly not be due process of law. (*People ex rel. MacDonald* v. *Leubischer, supra.*) The contention is now made that the investigation under consideration was carried on for the purpose of furnishing the Governor of the State with information so that he might properly be advised whether he should use his executive power to supersede the district attorney of Westchester county and designate the Attorney-General in his place to prosecute before the grand jury of that county a criminal charge against Walter S. Ward. The difficulty with the argument is that there is not a word of proof giving rise to the inference that such was the purpose of the Governor. There was no proof before him, so far as our knowledge goes, that the district attorney of the county of Westchester had failed in his duty. On the contrary, at the time the Governor made his communication to the Attorney-General, the district attorney had on several occasions been commended by justices of this court having in charge the disposition of questions arising in the case, for the great care with which he had conducted the prosecution, and for the high sense of duty which animated him in the matter. Not a word to the contrary appears in the record or was heard upon the argument. It also appears that the indictment against Ward failed, not because of lack of effort on the part of the district attorney, but for lack of proof that Ward was guilty of a crime. It nowhere appears that proof of guilt has been supplied or was submitted to the Governor. The communication of the Governor itself discloses nothing which indicates either that he considered the district attorney had failed in his duty or that he desired information to govern executive

action on his part. In fact the communication limits the investigation to be made to " the circumstances surrounding the death of one Clarence E. Peters." It makes no reference to matters connected with the performance or non-performance of his duties by the district attorney. Consequently, it seems to us that the investigation directed was not intended to further executive action; that the judicial power sought to be exercised upon the investigation had not been conferred by statute; or, if the statute in question was designed to confer it, that the statute was not constitutional. For these reasons, it seems to us that the application for an injunction should have been granted.

The order should be reversed and an order granted enjoining defendants as prayed in the complaint.

VAN KIRK, HINMAN and HASBROUCK, JJ., concur.

Order reversed on the law, with ten dollars costs and disbursements, and order enjoining defendants as prayed in the complaint granted.