Thomas Aloi, J.
Defendants moved by order directing the Attorney-General of the State of New York and the Acting Deputy Attorney-General in charge of the State-wide Organized Crime Task Force (hereinafter referred to as OCTF) to show cause why an order should not be made dismissing the indictments in the above-entitled actions on the grounds that section 70-a of the Executive Law is so vague that compliance therewith cannot be established, and is unconstitutional. Other grounds have also been urged by defendants but, in view of the disposition to be made on these issues, they will not be considered at this time.
The pertinent facts are the following: On or about January 19, 1965, plans were made for a sewer district in the Town of Fleming, County of Cayuga, New York. A resolution to create a district was passed by the voters in February of 1969; and in *123 June of 1970, bids were first let for the project but were rejected as being in excess of authorization. The project was rebid and a contract was granted to Kenneth C. Marshall, doing business as J & K Pipe Company on October 26, 1970. The company name was later changed by Marshall to Ron-Ore Soil Systems, Ltd., and a certificate of incorporation filed in December of 1970. The actual pipe laying was completed in May of 1972. In August of 1972, Ron-Ore Soil Systems, Ltd., was removed from the job and at that time, an alleged forged performance bond was discovered.
Subsequent thereto, OCTF commenced an investigation pursuant to section 70-a of the Executive Law. Numerous witnesses were examined in Onondaga County pursuant to subpoenas issued by the Task Force. Various business and financial records of the defendants were subpoenaed and banking records of Ron-Ore Soil Systems, Ltd. and individual defendants were obtained from banks by subpoenas issued by the Task Force pursuant to authority purportedly granted to it by section 70-a. All records from the Town of Fleming were similarly subpoenaed.
A written authorization from the District Attorney of Cayuga County was sent to the OCTF and received by it on November 12, 1973, consenting to the appearance of the Deputy Attorney-General or any of his assistants before a Cayuga County Grand Jury "for the purpose of conducting proceedings relating to any occurrence directly or indirectly involving or affecting the Town of Fleming Sanitary Sewer Project in which the Town of Fleming contracted with one J & K Pipe Company and/or Ron-Ore Soil Systems, Ltd., to construct a sewer system in said Township; as well as any related investigations concerning the misconduct or criminal liability of individuals connected with the construction of this Project, as such occurrences relate to the jurisdiction of your office under Section 70-a of the Executive Law of the State of New York.”
On December 5, 1973, a letter was sent by the Governor of the State of New York to the OCTF authorizing the Deputy Attorney-General in charge of the OCTF, or any of his assistants to appear before the Cayuga County Grand Jury for the purpose of "conducting investigations and prosecutions relating to any occurrence directly or indirectly involving or affecting the Town of Fleming Sanitary Sewer Project in which the Town of Fleming contracted with one J & K Pipeline Co., *124 and/or Ron-Ore Soil Systems, Ltd., to construct a sewer system in said Township; as well as any related investigations concerning the misconduct or criminal liability of the individuals connected with the construction of this project.”
The afore-mentioned investigation was, commenced in March or April of 1973 with the banking records subpoenaed prior to September of 1973. However, there is nothing in the record which indicates the authorization for OCTF’s investigation prior to the November 12 letter or any evidence indicating why its investigation was virtually complete before any official authorization from the Governor of the State of New York or the Cayuga County District Attorney was received. The Grand Jury which later received testimony with respect to the sewer district and which returned the indictments in question, had. been constituted in September of 1973 and was reconvened oh December 6, 1973. Commencing on that date, the only evidence heard by this Grand Jury related to the Town of Fleming Sewer District. Subsequently, 7 indictments containing a total of 57 counts against several individuals and the corporation, were handed down by the panel, to which these motions are addressed. Defendants have alleged that section 70-a of the Executive Law, which authorized OCTF to investigate and prosecute organized crime in the State of New York, is unconstitutional as enacted and as applied.
Subdivision 1 of section 70-a, which created OCTF, provides in part:
"There shall be established within the department of law, a statewide organized crime task force which, pursuant to the provisions of this section, shall have the duty and power:
"(a) To conduct investigations and prosecutions of organized crime activities carried on either between two or more counties of this state or between this state and another jurisdiction;
"(b) To cooperate with and assist district attorneys and other local law enforcement officials in their efforts against organized crime.”
Thus, by this subdivision, the investigative and prosecutorial powers of OCTF are limited to activities of organized crime perpetrated between two or more counties of this State or between this State and another jurisdiction. Given the limited resources and restricted geographical jurisdiction of local District Attorneys, this statute was enacted to create a task force with broad investigative and prosecutorial powers to deal *125 with, on a State-wide basis, the highly complex and diversified organized criminal activity which, the Legislature has recognized, has pervaded our State’s businesses and governmental institutions. (See Executive Law, § 70-a; L 1970, ch 1003, § 1.)
Notwithstanding this laudatory objective however, the statute has given rise to interpretive enigmas, while opening a veritable "Pandora’s Box” of substantive and procedural constitutional questions.
A general criticism frequently directed to the statute is that it fails to restrict activities carried out by the agency which it creates (OCTF) to the area which it was intended to address, viz: organized crime. This failure results from the omission from the statute of a legal or functional definition of "organized crime”, which is described in the materials which accompanied the legislation simply by a reference to noteworthy symptoms of the phenomenon’s manifestations. This omission reflects the difficulty of incorporating the variety of these activities in an all-encompassing definition. It, however, has permitted unrestricted expansion of the exercise of OCTF’s powers conferred on it for the pursuit of organized crime and has precipitated questionable assaults on the constitutionally protected rights of individuals. While this court recognizes the unwavering commitment needed to defeat organized criminal activity in the State, it cannot condone and will not legitimize, solutions to the pervasive problem which harbour seeds of official repression of individual rights. (See Association of the Bar of the City of New York, Reports of Committees of Assn, of Bar concerned with Fed. Legislation, The Proposed Organized Crime Control Act of 1969 [S 30], 5-8, Vol. 9, No. 1, July, 1970.)
The United States Supreme Court in Giaccio v Pennsylvania (382 US 399, 402) in 1966, held that, "it is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.” Conspicuously absent from section 70-a is a comprehensible definition of "organized crime” and an ascertainable standard that limits the investigative and prosecutorial scope of OCTF’s authorized activities. Certainly, not every crime which touches two or more counties in the State or is perpetrated between this State and another jurisdiction was meant to be within the *126 scope of OCTF’s investigations. It is only when these activities relate to "organized crime” and are perpetrated in two or more counties in the State or in this State and another jurisdiction that OCTF is vested with authority by subdivision 1 of section 70-a of the Executive Law, to investigate and prosecute these offenses.
However, since the term "organized crime” is not defined by the statute, OCTF is powerless to establish that it is properly in an area meant for it to investigate and that, when investigating with compulsory process, it is exercising the authority conferred on it by the statute from which it sprang. Therefore, the implementation of the statutory objective is carried on in a virtual vacuum, with no standard against which to measure its propriety and with possible abridgement of constitutionally protected rights.
Notwithstanding the geographical requirement of multicounty criminal activity, there are no substantive guidelines to facilitate and limit the scope of OCTF’s investigative activities. It is believed that the existence and investigation of organized crime is not, by the statute, and should not, by judicial construction, be justified, limited or analyzed simply in terms of geographical boundaries. While multi-county activity is one of the prerequisites to OCTF action, it is not the only prerequisite; "organized crime” is also required, and without statutory definition of the term, attempts at establishing its existence must fail.
Neither may authority to present evidence before a Grand Jury, conferred by the Governor and the local District Attorney pursuant to subdivision 7 of section 70-a, be considered a substitute for a showing by OCTF, itself, when its authority to investigate is challenged, that the predicate for its investigative authority exists. Even if the authorization to prosecute, under subdivision 7 of the statute, be considered sufficient justification for appearance before the Grand Jury for the purpose of presenting evidence of multi-county criminal activities, nothing in the statute suggests that such prosecutorial authorization satisfies the requirement of preinvestigative organized crime. The term "organized crime” was obviously intended to be used as a criterion for initiating an investigation, not as an ex post facto justification for OCTF involvement in an area where purported criminal activity has occurred. In the cases at bar, OCTF failed to establish the predicate for its investigative activities, to wit: that the transactions *127 they were investigating were related to organized crime and were carried on over two or more counties. Even when this court requested that OCTF show in camera that the evidence discovered was related to organized crime or that there was a reasonable basis for a suspicion of such relationship, it refused; and nothing contained in the indictments, affidavits or other supporting papers revealed anything but criminal activity which was properly within the jurisdiction of the local District Attorney and outside that of OCTF. Furthermore, it was not until after its investigation was complete that OCTF could demonstrate that the transactions it was investigating were multi-county in nature.
In this connection it may be noted that, although the 7 indictments handed down against the defendants contained 57 separate counts of various alleged criminal activity, 3 counts which are offered in support of the alleged multi-county activities were charges emanating from the hearings to which defendants were subpoenaed. The criminal activity alleged to have taken place in Onondaga County, to wit: perjury, could have taken place in Cayuga County, had that county been the situs of OCTF’s investigation. It would be a judicial indulgence in form over substance to allow OCTF to create multi-county criminal activity merely by conducting its investigations in counties other than that in which the principal alleged criminal activity took place.
A fourth count, which alleged tampering with physical evidence in Oswego County, arose out of alleged destruction of subpoenaed materials. This activity however, occurred subsequent, rather than prior, to the OCTF investigation and, therefore, cannot serve as the jurisdictional basis for OCTF’s investigations. Additionally, two counts which allege a conspiracy in Oswego County state that the necessary overt act in the conspiracy took place in Cayuga County.
The legislative intent in enacting section 70-a of the Executive Law was to allow OCTF to investigate organized criminal activities that actually occurred in two or more counties of the State, but not to make the activities multi-county by changing the location of OCTF’s investigations to meet the jurisdictional requirement. This court finds nothing in the record that concerns organized crime activities which have occurred in two or more counties such as to authorize OCTF’s investigation consistent with the intent of subdivision 1 of section 70-a of the Executive Law.
*128 The conclusion this court has reached as to the inadequacy of the statute in question and as to the activities of the Deputy Attorney-General acting thereunder, is supported by an examination of section 63 of the Executive Law, which establishes the power of the State’s Attorney-General. Subdivision 8 of that section provides, in part: "Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice.”
It seems clear that organized criminal activities are matters concerning "the public peace, public safety and public justice” within the meaning of the subdivision last quoted, and that approval by the Governor prior, rather than subsequent, to the initiation of an investigation by the Attorney-General would be required for an inquiry by that officer under section 63. Yet, under section 70-a of the Executive Law, with which we are concerned, approval by the Governor is required only prior to the prosecution of matters concerning "organized crime”, which clearly affects the public’s general welfare. The statute allows OCTF to make its own determination vis-á-vis, the activities it will investigate, independent of any objective third party. Absent a defined standard to limit, and an objective third party to approve the initiation of an investigation, OCTF could go into areas either that were not intended to be investigated, or that should not be affected by this body. This court perceives of no compelling reason to support, against the claim of fatal indefiniteness, such a statute, which imposes less of a restriction on an arm of the State’s Department of Law than that imposed on the office of the. Attorney-General itself by section 63 of the Executive Law.
OCTF has relied heavily on the use of nonjudicial subpoenas duces tecum to procure evidence in its investigations which either constituted or led to proof adduced before the Grand Jury prior to its return of the challenged indictments. Subdivision 4 of section 70-a grants the subpoena power to OCTF and reads in part: "the deputy attorney general in charge of the organized crime task force is empowered to conduct hearings at any place within the state, to administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation, and require the production of any books, records, documents or other evidence he may deem relevant or material to an investigation.”
*129 In Matter of A ’Hearn v Committee on Unlawful Practice of Law of N.Y. County Lawyers’ Assn. (23 NY2d 916) the court articulated the limitations on the nonjudicial subpoena power of a governmental agency by stating that an agency asserting its subpoena power must show its "authority, relevancy [of the items sought], and some basis for inquisitorial action” (p 918). Furthermore, in issuing a subpoena duces tecum, "No agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered” (p 918).
Defendants contend that they, were only superficially informed as to the nature and purpose of OCTF inquiries or that they were the target of an investigation. OCTF used its subpoena power to procure many of the personal, business and banking records of the defendants from various banking institutions, not for production before a grand jury, but before an investigative arm of OCTF itself. These subpoenas were used in lieu of a search warrant, and were, not issued when any grand jury was impaneled.
Almost 90 years ago, the United States Supreme Court held that, "a compulsory production of a man’s private papers [to establish a criminal charge against him] * * * [is] within the meaning of the Fourth Amendment”. (Boyd v United States, 116 US 616, 622 [1886].) In the recent decision of United States v Miller (500 F2d 751, CA 5th [1974]), the court reaffirmed Boyd (supra) in discussing the validity of a subpoena duces tecum used to obtain information contained in an individual’s business records held by a bank. The Miller court relied, in reaching its decision, on California Bankers Assn v Schultz (416 US 21) while holding (p 758) that a "subpoena, issued not by the court or by the grand jury, but by the United States Attorney’s office, for a date when no grand jury was in session, and which in effect compelled broad disclosure of [defendant’s] financial records to the government, does not constitute sufficient 'legal process’ within the meaning of the majority opinion.” Thus, the Miller court held that obtaining copies of Miller’s bank checks by means of a faulty subpoena duces tecum constituted an unlawful invasion of Miller’s privacy, and that any evidence so obtained should have been suppressed.
In view of these authorities, this court believes that subdivision 4 of section 70-a, on its face and as applied by OCTF, is *130 unconstitutional. This section does not compel OCTF to show that its subpoenas are relevant, material or necessary to investigate organized crime. It merely assumes that OCTF will act in good faith and not abuse its discretion. As Justice Powell, in his concurring opinion in California Bankers (supra, p 78), stated, "Financial transactions can reveal much about a person’s activities, associations and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of judicial process. In such instances, the important responsibility for balancing societal and individual interests is left to unreviewed executive discretion, rather than the scrutiny of a neutral magistrate”. Thus, by not requiring OCTF to show in other than conclusionary form, that its subpoenas are relevant and material, subdivision 4 of section 70-a has opened the door to the unlawful invasion of an individual’s right to privacy, guaranteed by the Fourth Amendment.
OCTF contends that the Miller case can be distinguished from the case at bar on two grounds: Miller concerned private records, while this case concerns primarily corporate records; and Miller concerned Federal law while the instant case concerns a delegation of power from the State Legislature. This court perceives of no compelling reason why the rationale of Miller should not be applicable to records of a closely held corporation and firmly believes that an individual’s right to privacy is an inherent right which cannot be abridged by either a United States Attorney General or a State investigatory body acting pursuant to a State statute. This court fully realizes that OCTF has a unique function in our State’s Department of Law, and, therefore, is empowered to act under different procedures than the local District Attorneys; however, OCTF is not licensed to abridge the constitutionally protected rights of individuals in the course of their investigations.
The defendants contend that the use of the subpoenas and the failure of OCTF to comply with subdivision 2 of section 73 of the Civil Rights Law, to wit: provide a copy of this section, and a general statement of the subject of the investigation, has caused sundry violations of their civil and constitutional rights. As the Supreme Court said in Watkins v United States (354 US 178, 208-209): "It is obvious that a person compelled *131 to make his choice is entitled to have knowledge of the subject to which the interrogation is deemed pertinent. That knowledge must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense. The 'vice of vagueness’ must be avoided here as in all other crimes.”
OCTF maintains that because it was not specifically included in section 73 of the Civil Rights Law, the statute is not applicable to its operations. However, without a clear indication to the contrary, it is unthinkable that the Legislature when it enacted section 70-a of the Executive Law, intended to provide for a criminal investigation against a particular individual, yet strip him of privileges and safeguards which otherwise would be accorded him. When a person is the prime suspect of a criminal investigation, such as the case at bar, it is the duty of the court to enforce all of the safeguards necessary to protect his statutory and inherent constitutional rights.
The OCTF contends that the defendants have waived their right to object to the relevancy and materiality of the subpoenas by not making a timely motion to quash. This court recognizes that an issue must be raised before it can be met, and realizes that subdivision 4 of section 70-a does not require OCTF to take affirmative steps to show the information sought is relevant or material to its investigation. It is not suggested, however, that OCTF has violated the law which empowers it to subpoena, but rather that the law, itself, is unconstitutional on its face and as applied. The failure of subdivision 6 of section 70-a to require OCTF to apprise the defendants of the nature and objective of its investigations or comply with the mandates of section 73 of the Civil Rights Law, accounts for the defendants’ inability to ever challenge the relevancy or materiality of the subpoenas. Furthermore, this court believes that a defendant never waives his right to object to the subpoena power of an investigative agency which he believes is acting ultra-vires; to wit: subpoenaing records which its statutory authority does not allow it to investigate. Such an objection is directed to the statutory authority to subpoena rather than the relevancy or materiality of each subpoena issued.
A proceeding before a grand jury "constitutes the only general criminal investigation known to the law * * *. To the grand jury, and to it alone, is given the power of investigation *132 without a definite charge”. (Ward Baking Co. v Western Union Tel. Co., 205 App Div 723, 728.) When an individual is the target of an investigation, his constitutionally conferred privilege against self incrimination is deemed violated even though he does not claim or assert the privilege. (People v Steuding, 6 NY2d 214.) Defendants have not waived their right to object to the relevancy or materiality of the subpoenas, but rather have properly challenged, at an appropriate time, the nature and scope of these subpoenas, which they believe constitute a general fishing expedition and, as such, amount to an unreasonable search and seizure. (Schwimmer v United States, 232 F2d 855 [CA 8th, 1956].) Notwithstanding broad statutory language, an investigatory agency does not have unbridled discretion as to the nature and scope of its investigations. (See Matter of A’Hearn, 23 NY2d 916, 918, supra.)
Although there is some evidence in the record that crime was committed in two or more counties, OCTF has failed, and continually refuses to connect these activities with "organized crime”. It is not only that OCTF’s subpoena power ipso facto contravenes the constitutional rights of individuals, but when used to procure information, in contemplation of possible criminal prosecution, in an area which has no legal definition (emphasis added), the propensity for continual abuse becomes ominously clear.
Accordingly, it is the opinion of this court that for the reasons stated, section 70-a of the Executive Law is invalid and is unconstitutional as enacted and applied and that, therefore, the indictments against the defendants should be dismissed.