In the Matter of ALEX DI BRIZZI, Appellant. JOSEPH M. PROS-KAUER et al., as Members of the New York State Crime Commission, et al., Respondents.

Argued June 21, 1951; decided July 11, 1951.

*Louis Waldman, Martin Markson* and *Seymour M. Waldman* for appellant. I. The subpœnas herein require petitioner to appear and testify in an executive investigation into the commission of crime and petitioner's relation to such crime. (*Ward Baking Co.* v. *Western Union Tel. Co.,* 205 App. Div. 723.) II. The Governor has no power under the Constitution and laws of the State of New York to create the New York State Crime

Commission to conduct hearings, subpœna witnesses and exercise the powers, duties and functions conferred on this commission by the Executive Order. (*Ward Baking Co.* v. *Western Union Tel. Co.,* 205 App. Div. 723; *People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463.) III. Subdivision 8 of section 62 of the Executive Law does not authorize the creation of the New York State Crime Commission with its broad powers, duties and functions to conduct an investigation into organized crime, who committed it, and the links, if any, between organized crime and its perpetrators and any unit of government. (*Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104; *Matter of McMaster* v. *Owens,* 193 Misc. 284, 275 App. Div. 506; *Metropolitan Life Ins. Co.* v. *Durkin,* 195 Misc. 1040; *Neuendorff* v. *Duryea,* 6 Daly 276; *Ward Baking Co.* v. *Western Union Tel. Co.,* 205 App. Div. 723; *Matter of Ellis,* 176 Misc. 887.) IV. If subdivision 8 of section 62 of the Executive Law is construed to authorize the creation of the New York State Crime Commission, with the powers, duties and functions conferred it, then the statute is unconstitutional. (*Ward Baking Co.* v. *Western Union Tel. Co.,* 205 App. Div. 723; *Matter of Both,* 200 App. Div. 423; *People* v. *Hebberd,* 96 Misc. 617; *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123; *People ex rel. Travis* v. *Knott,* 204 App. Div. 379; *People ex rel. Livingston* v. *Wyatt,* 186 N. Y. 383; *People ex rel. Fleming* v. *Mayer,* 41 Misc. 289.) V. The power of subpœna conferred on the Attorney-General is constitutional only when conferred by a statute dealing with specific economic or industrial activities deemed subject to license or similar control and preserving the rights of the witness by express safeguards which do not exist in the present case. (*Dunham* v. *Ottinger,* 243 N. Y. 423; *Matter of Davies,* 168 N. Y. 89; *Hill* v. *Florida,* 325 U. S. 538; *Thomas* v. *Collins,* 323 U. S. 516; *People ex rel. Kenny* v. *Adams,* 292 N. Y. 65.) VI. In naming the members of the State Crime Commission, the Governor invaded the discretion conferred upon the Attorney-General by subdivision 8 of section 62 of the Executive Law. Nor did the Attorney-General have power under that section to name a commission acting as a single entity. In addition the commission has failed to file its rules with the Department of State as required by section 8 of article IV of the State Constitution.

*Nathaniel L. Goldstein, Attorney-General, John M. Harlan, Special Assistant Attorney-General (Ben A. Matthews and Jerome G. Shapiro of counsel), for respondents.* I. The present investigation is authorized by subdivision 8 of section 62 of the Executive Law. II. The present investigation is authorized by section 8 of the Executive Law. (*Matter of Bleakley* v. *Schlesinger,* 294 N. Y. 312; *Schiffman* v. *Bleakley,* 46 N. Y. S. 2d 353.) III. The present investigation pursuant to the Executive Law is in aid of the Governor's duties. (*People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463.) IV. A statute conferring subpœna power on the executive in aid of his functions is constitutional. (*Dunham* v. *Ottinger,* 243 N. Y. 423; *Matter of MacNamara,* 128 Misc. 84, 218 App. Div. 822; *Schiffman* v. *Bleakley,* 46 N. Y. S. 2d 353; *Matter of Bleakley* v. *Schlesinger,* 294 N. Y. 312.) V. The issuance of the present subpœnas violates no individual constitutional right of petitioner. (*People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463; *Matter of Withrow* v. *Joint Legislative Comm.,* 176 Misc. 597.) VI. There has been no unconstitutional interference with petitioner's private affairs. (*Matter of Ottinger,* 216 App. Div. 271; *Schiffman* v. *Bleakley,* 46 N. Y. S. 2d 353; *Matter of Ferrari,* 134 Misc. 728; *Matter of Davies,* 168 N. Y. 89.)

CONWAY, J. In this proceeding, petitioner seeks to challenge the legality and constitutionality of an investigation ordered by the Governor, to be conducted by the Attorney-General and certain " officers of the Department of Law ", who were specially appointed for the purpose and who were denominated, collectively, as the " New York State Crime Commission ".

The petitioner was subpœnaed to appear at a specified place " before the NEW YORK STATE CRIME COMMISSION, one of its members, or such other officer as shall have been designated by the Attorney General ", on April 24, 1951, " as a witness to testify and give evidence in an inquiry into matters concerning the public peace, public safety and public justice, as directed by the Executive Order of the Governor of the State of New York dated March 29, 1951   *   *   *." The subpœna was issued over the names of the members of the denominated " New York State Crime Commission " and the Attorney-General and was signed by the " Chief Counsel to the New York State Crime

Commission and Special Assistant Attorney General.'' In obedience to the subpœna, petitioner appeared on the date specified therein and was asked to sign a waiver of immunity. Upon his refusal to do so on advice of counsel, no further proceedings were had, and he was served with a second subpœna, identical in form with the first, requiring his appearance on May 8, 1951. On that date, the present application to quash, set aside and vacate the subpœnas was made at Special Term, and petitioner's examination was postponed pending the determination of the issues raised herein.

Special Term (BENVENGA, J.) denied the application (199 Misc. 670) and the Appellate Division affirmed unanimously. Petitioner now appeals to this court, as of right, upon constitutional grounds. (Civ. Prac. Act, § 588, subd. 1, cl. [a]).

Petitioner contends that the subpœnas are illegal and void and should be quashed upon the following grounds: (1) That there is no statutory authority in this State for an investigation such as that contemplated by the Executive Order and, particularly, that there is no statutory authority for the creation of a '' New York State Crime Commission '', having subpœna powers; (2) that if the only pertinent statute, hereinafter to be nőted, purports to grant such authority, it is unconstitutional; and (3) that petitioner's personal constitutional rights have been violated.

The Governor's Executive Order of March 29, 1951, named five distinguished men as constituting '' the New York State Crime Commission to investigate and take action concerning the relationship between organized crime and Government, with the following duties, powers and authorities: ''. In the first numbered paragraph of the order, the commission was directed: '' To investigate generally the relationship between organized crime and any unit of Government anywhere in the state.'' Paragraph III directed the commission to '' examine into the relationship between the Government of the State and local criminal law enforcement with particular reference '' to seven specified problems. The commission was authorized to co-operate with '' all public officers engaged in the investigation or the prosecution of crime or corruption '' (Par. II), and to '' conduct public or private hearings to accomplish the sev-

eral purposes of the commission ". (Par. IV.) All units of the State and local governments were directed to co-operate with the commission. (Par. VII.) The order further provided:

## " (V)

" Pursuant to the provisions of Section 62, Subdivision 8 of the Executive Law, the Attorney General of the State is hereby directed to inquire into the matters hereinabove set forth involving the public peace, public safety and public justice and is requested to do so by appointing the members of the commission and such counsel, deputies, officers and other persons as the commission may require to accomplish the purpose of this order and to fix their compensation.

## " (VI)

" The commission hereby established and the Attorney General in cooperation with the commission are hereby authorized and directed to exercise for the accomplishment of the purpose of this order all powers and authorities set forth in Section 62, Subdivision 8 of the Executive Law, and are hereby authorized by me to exercise any power to administer oaths and examine witnesses under oath, to subpoena any person, books, papers or records which I may have or have the power to delegate by virtue of any of the provisions of the Executive Law."

The Attorney-General thereupon appointed each of the five men mentioned in the Executive Order " an officer of the Department of Law of the State of New York, to wit, a member of the New York State Crime Commission ".

Subdivision 8 of section 62 of the Executive Law (now § 63, subd. 8) which was expressly mentioned in the Executive Order (*supra*) provides in part as follows: " Whenever in his judgment the public interest requires it, *the attorney-general* may, with the approval of the governor, and *when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice.* For such purpose he may, in his discretion, and without civil service examination, appoint and employ, and at pleasure remove, such deputies, officers and other persons as he deems necessary, determine their duties and, with the approval of the governor, fix their compensation. * * *
*The attorney-general, his deputy or other officer designated by*

*him, is empowered to subpœna witnesses,* compel their attendance, examine them under oath before himself or a magistrate and require the production of any books or papers which he deems relevant or material to the inquiry.  \* \* \* ''  (Emphasis supplied.)

We agree with petitioner that there is no statutory authorization for the creation of a '' New York State Crime Commission '' as such. That phrase is unknown to any statute in this State. Our inquiry does not end there, however, for the Governor, after purporting to constitute such a commission and stating the scope of the investigation in his Executive Order, went further in paragraphs V and VI thereof and directed the Attorney-General, pursuant to subdivision 8 of section 62 of the Executive Law, '' to inquire into the matters hereinabove set forth involving the public peace, public safety and public justice '' and '' requested '' the Attorney-General to do so by appointing the members of the commission. The Attorney-General, as noted above, has appointed each of the persons named in the Executive Order as '' an officer of the Department of Law of the State of New York, to wit: a member of a commission to be known as the New York State Crime Commission ''. That procedure was in accordance with the statute which authorizes the Attorney-General to appoint and employ '' such deputies, officers and other persons as he deems necessary ''. The further designation that, collectively, the five named persons are to be called the New York State Crime Commission cannot invalidate the otherwise legal appointments. It is merely a convenient name for a group of individuals engaged in a common endeavor. Nor do we think that the Attorney-General was deprived of the discretion granted to him under the statute in making the appointments. The Governor, in his Executive Order, did not *direct* the Attorney-General to appoint the named individuals, but merely *requested* him to do so. The fact that the Attorney-General, who is an elected official in his own right, acceded to the Governor's request and appointed those named cannot be taken to mean that he was thereby prevented from exercising his own discretion. Likewise, we do not think it of any consequence that certain of the members of the commission are not lawyers, since the statute permits the Attorney-

General to appoint "deputies, officers and other persons" and this is not limited to attorneys.

We are thus led to the question of whether the investigation to be conducted by the Attorney-General, and his officers constituting the Crime Commission, is within the purview of subdivision 8 of section 62 of the Executive Law. That subdivision grants authority to "inquire into matters concerning the public peace, public safety and public justice." The words there used by the Legislature are sufficiently broad to encompass an investigation such as the one here involved, the principal purpose of which is to determine whether there exists a relationship between organized crime and any units of government in the State. We think the Legislature intended to use the words in their usual and ordinary sense, rather than to ascribe a narrow and technical meaning to them. Petitioner, however, points to the fact that the statute — Executive Law, section 62, subdivision 8 — was enacted in May, 1917, one month following the entry of the United States into World War I (L. 1917, ch. 595) and urges that it was merely "a war measure with the limited scope of enabling the executive to cope with riots, insurrections, rebellions, sabotage, and similar acts interfering with the very foundations of the State." There is little doubt, of course, that the Legislature first recognized the need for such a statute as this because of a war emergency. The Legislature, in enacting the statute, however, utilized general terms, and did not, either expressly or by implication, limit its operation to a time of war. We may not do so now. As we noted in *People ex rel. McClelland* v. *Roberts* (148 N. Y. 360, 368): "A general law may, and frequently does, originate in some particular case or class of cases which is in the mind of the legislature at the time, but, so long as it is expressed in general language, the courts cannot, in the absence of express restrictions, limit its application to those cases, but must apply it to all cases that come within its terms and its general purpose and policy."

Likewise unavailing to petitioner is the fact that, in 1918, the then Attorney-General in his report stated that the powers conferred by subdivision 8 of section 62 of the Executive Law should not be continued in peacetime and recommended that the statute be repealed at the end of the war (1918 Atty. Gen. 16).

The simple answer to this argument is that the Legislature failed to heed the recommendation of the Attorney-General and refused to repeal the statute. That, we think, is fairly conclusive evidence that the Legislature determined that the powers conferred by the statute upon the Governor and the Attorney-General might be necessary for the public good in time of peace as well as in time of war. Moreover, petitioner's contention on this point is self-defeating, for even if it be assumed that the statute be applicable only when " sabotage " or some such peril threatens " the very existence of the State ", how can it be denied that a " relationship between organized crime and any unit of Government anywhere in the state ", if shown to exist, might have that very result. An alliance between the underworld and public officials would strike at the foundation of law and order in this State. Organized crime which subverts local units of government is as dangerous a substantive evil as sabotage.

It is thus quite clear that organized crime and its relationship to units of government in this State are " matters concerning the public peace, public safety and public justice " within the meaning of subdivision 8 of section 62 of the Executive Law. That being so, the question then arises as to whether the Legislature constitutionally had the power to authorize such an investigation. As a general proposition, it is clear beyond dispute that the Legislature may constitutionally confer authority upon an executive department to exercise subpœna power in connection with an investigation in aid of the executive function. In *Dunham* v. *Ottinger* (243 N. Y. 423), we said (pp. 434–435):

" The power to investigate and examine witnesses to the end of a better discharge of their duties has been conferred upon administrative boards and officials without successful challenge by so many statutes that it is undesirable to refer to them all. * * *

" The power here attacked is akin to that right of the Legislature to investigate and to subpœna and examine witnesses to the end of safeguarding public interests by appropriate legislation and which is so well established as to have passed beyond the realm of controversy. (*People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463.) " Thus, the only question here presented is whether the investigation directed by the Governor can reason-

ably be said to be for the purpose of securing information to advise him in his executive function.

Under the State Constitution, the Governor's duties include the following (art. IV, § 3): " * * * He shall communicate by message to the legislature at every session the condition of the state, and recommend such matters to it as he shall judge expedient. He shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed. * * * " Obviously, we cannot say that it is of no importance to the Governor in the discharge of his duties under the Constitution that he have the information sought to be obtained through the present investigation. If there be a relationship between organized crime and units of government in the State and if there be defects in the existing relationship between the State Government and local law enforcement, these are matters affecting " the condition of the state " which should be communicated to the Legislature with appropriate recommendations for their elimination. If existing laws be adequate, at least the Governor would have additional information so that he might " take care that the laws are faithfully executed."

Since there exists a reasonable relation between the action taken by the Governor, through the Attorney-General, and the proper discharge of the executive function, it cannot be said that subdivision 8 of section 62 of the Executive Law, as here utilized and applied, is unconstitutional.

The fact that the Attorney-General and the members of the Crime Commission, in determining whether there exists a relationship between organized crime and units of government, may find it necessary to inquire as to whether individual crimes have been committed does not, as petitioner urges, render the investigation unconstitutional as a usurpation of the traditional province of the grand jury in each county of the State. This is a *general* investigation into *organized* crime and its relation to government. As an incident thereto, it may be that the existence of specific, individual crimes will be uncovered, but that will merely be collateral and subordinate to the main object of inquiry. The purpose of the investigation is to secure information to guide executive action, not to indict or punish any

individuals. If the fact that a proposed investigation might be expected to disclose that crimes have been committed were to render such investigations unconstitutional, then few, if any, legislative or executive commissions could ever be validly created, for such commissions are not ordinarily established unless there is reason to believe that some violation of law has occurred.

The case upon which petitioner so heavily relies — *Ward Baking Co.* v. *Western Union Tel. Co.* (205 App. Div. 723) — is clearly distinguishable from the case at bar. In the *Ward* case, the Governor, purporting to act under subdivision 8 of section 62 of the Executive Law, directed the Attorney-General '' to inquire into the circumstances surrounding the death of one Clarence E. Peters '' (p. 725). The court held that the investigation '' was directed and conducted with the sole purpose in view of obtaining proof that the individual Ward killed the individual Peters with malice aforethought '' (p. 727) and that the statute was not intended, and could not constitutionally have been intended, '' to provide for a criminal investigation against a particular individual '' (p. 729). But, as we have said before, the purpose in the case at bar is not to conduct '' a criminal investigation against a particular person '', which is for a grand jury, but rather to investigate anywhere in the State the relationship between organized crime and units of government and the relationship between the State Government and local law enforcement. That is a vastly different purpose, and one which properly and constitutionally comes within the purview of the statute.

At this stage of the proceeding, on an application to quash the subpœnas, we cannot say that any personal constitutional right of petitioner has been violated. Whether or not his rights will be infringed by anything done pursuant to the subpœnas is not now before us. Either expressly or by implication of law, the safeguards upon the rights of witnesses before an executive commission, which we enumerated in *Dunham* v. *Ottinger* (*supra*, pp. 438–439), are likewise operative here.

The order appealed from should be affirmed, with costs.

FULD, J. (concurring). Study of the Executive Order makes clear that the Governor acted under both section 8 and subdivision 8 of section 62 of the Executive Law and, that being so,

there can be no doubt either as to the authority of the Governor to appoint the so-called Crime Commission or as to the power of that commission to issue the subpœna here in question.

DYE, J. (dissenting). I dissent and vote for reversal. We are all agreed that there is no authorization for the creation of a " New York State Crime Commission " as such. In the absence of constitutional authority or appropriate legislation, neither the Governor nor the Attorney-General has the power of subpœna or testimonial compulsion. However much the ultimate purpose here sought to be attained may be indicated and desired, it must under our system of government be accomplished according to law. The cardinal precept upon which the constitutional safeguards of personal liberty ultimately rest is that a government should be one of laws. (*Jones* v. *Securities & Exch. Comm.*, 298 U. S. 1.)

In the present case, where the Governor and the Attorney-General, acting under a sense of public duty in their understandable revulsion against organized crime, which has so menacingly manifested itself in recent years (see Proceedings of the Governor's Conference on Crime, &c. [1935], hereinafter referred to as 1935 Governor's Conference), have selected as members of the commission a group of lawyers and laymen of unquestioned character and integrity, the temptation to submit to approval is strong. But it is by such well-intentioned approaches and deviations from legal modes of procedure that dangerous practices often secure their first foothold (*Boyd* v. *United States,* 116 U. S. 616, 635).

We are not here concerned with the right of the Governor or his duly appointed representatives to gather information, hold hearings and invite voluntary attendance of interested persons in aid of the performance of his constitutional duties (see 1935 Governor's Conference). We are dealing with the executive subpœna power. It may not be found in section 3 of article IV of our State Constitution, which provides that the Governor shall recommend to the Legislature such matters as he shall judge expedient. The President of the United States has a like duty with respect to the Congress (U. S. Const., art. II, § 3). Yet our attention has not been called to a single instance throughout all the course of our nation's history where the

power here claimed was exercised by the Chief Executive of the State or Nation, and these constitutional provisions have never been judicially or administratively construed as conferring such power in the absence of an express enabling act. Such power must be " authorized by law " (Civ. Prac. Act, § 403).

When the Legislature has chosen to grant the power to subpœna, it has done so by express legislation limited to a specific purpose, as, for example, when it gave such power to the Governor under the Moreland Act (Executive Law, § 8), and in removal proceedings (Public Officers Law, § 34); to the Attorney-General under the Martin Act (General Business Law, §§ 352–359 [fraudulent practices in the sale of securities]), and the Donnelly Act (General Business Law, §§ 340–347 [monopolies and combinations in restraint of trade]), and with respect to elections (Executive Law, § 66-a, now § 69). (See Attorney-General's Statement on the Limits of his Jurisdiction made to 1935 Governor's Conference, pp. 655–656.) Indeed, even when the Legislature itself sought to exercise such power, it provided specific legislation for the purpose (Legislative Law, §§ 60, 62-a; Penal Law, § 1329). These statutes follow substantially the same pattern as to subpœna powers in recognition of existing limitations (*People ex rel. MacDonald* v. *Keeler,* 99 N. Y. 463), and have had our approval as valid enactments in *Dunham* v. *Ottinger* (243 N. Y. 423 [Martin Act]), and *Matter of Davies* (168 N. Y. 89 [Donnelly Act]). Thus, while it appears clear that the Legislature may confer subpœna powers on the executive in appropriate cases, whenever it has done so it has taken care to limit such powers to the matters specifically covered by the statute.

A majority of this court has concluded that the executive order and the proceedings taken thereunder, which are now challenged, fall within the purview of subdivision 8 of section 62 (now § 63, subd. 8) of the Executive Law, notwithstanding their agreement that there " is little doubt, of course, that the Legislature first recognized the need for such a statute as this because of a war emergency." (P. 214.)

This statute was originally enacted a few weeks after our entry into World War I as a " Peace and Safety Act " by chapter 595 of the Laws of 1917, effective May 21, 1917, for the purpose of dealing with wartime sabotage, espionage and sub-

versive activities by enemy agents and sympathizers (1917 Atty. Gen. 8–9, under the caption " Espionage Act "; 1918, p. 16, under the caption " Public Peace and Safety Act "; 1919, p. 5, under the caption " Radicalism "). The phrases " public peace ", " public safety" and " public justice " were thus employed in keeping with an historical and established meaning, and as so used were properly referable to the situation then obtaining (Atty. Gen., *id.*; see Penal Law, art. 188; N. Y. Const., art I, § 4; Penal Law, arts. 14, 168; *Ward Baking Co.* v. *Western Union Tel. Co.*, 205 App. Div. 723; *Neuendorff* v. *Duryea*, 6 Daly 276). The Attorney-General made full use of the authority thus conferred, not only to deal with wartime problems affecting the administration of State matters concerning public peace, safety and justice, but also to give useful assistance to the Department of Justice in its prosecution under the Espionage and Selective Service Acts and other wartime measures (1917 Atty. Gen. 8–9). Following the termination of World War I, the Attorney-General in his 1918 Report (p. 16) recommended the repeal of this statute after stating that it was " well suited to war conditions ". Nothing turns on the circumstance that the Legislature permitted the statute to remain in its original form, as is the case with other war measures. It is significant that Attorneys-General and Governors through all the intervening thirty-four years have never treated this enactment as being anything other than a war measure, with the exception hereinafter noted.

Long ago Chancellor KENT declared that the intent with which statutes were enacted " is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the objects and the remedy in view " (1 Kent's Commentaries 462; see, also, McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], § 95). Very recently we have pointed out that courts " do not merely read the bare end product of the legislative labors " but rather " read the statute in the light of the state of facts which were found by the Legislature, and which prompted the enactment " (*St. Nicholas Cathedral* v. *Kedroff*, 302 N. Y. 1, 31), and that " statutes, directed against known and stated evils, are not to be stretched to cover situations having no real or reasonable relation to those evils " (*Metropolitan Life Ins. Co.* v. *Durkin*, 301 N. Y.

376, 381). Long-continued administrative interpretation of a statute by those whose business it is to operate thereunder is persuasive in its construction and is entitled to great, if not controlling, weight (McKinney's Cons. Laws of N. Y. Book 1, Statutes [1942 ed.], § 129; *Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104, 108).

The only time subdivision 8 of section 62 was invoked with respect to common-law and statutory crimes on the local level, the attempt was promptly rejected (*Ward Baking Co.* v. *Western Union Tel. Co., supra*). To give now to the words " public peace, public safety and public justice " as used in subdivision 8 of section 62 a meaning broad enough to include authority to " investigate *generally* the relationship between *organized* crime and any unit of Government *anywhere* in the state " (Executive Order, emphasis supplied) is to accomplish by judicial fiat something the Legislature could not reasonably have had in mind at the time the statute was enacted more than three decades ago. It is tantamount to giving the executive the power of the legislative and judicial branches of our government with respect to testimonial compulsion, for what matters do not touch " public peace, public safety and public justice " if those words' are to be given their broadest possible meaning, without reference to the mischief felt and the remedy in view at the time of enactment? Under such interpretation, long-recognized constitutional safeguards insuring due process are bound to be encroached upon. Organized crime is not an abstract concept; it necessarily embraces specific unlawful acts by particular individuals, and the line between organized and unorganized crime is often difficult to detect. Assuming subdivision 8 of section 62 to be a valid enactment as a defense and safety wartime measure, it does not follow that its language may be extended to embrace general investigatory power coupled with testimonial compulsion, and particularly so in the light of existing constitutional and statutory provisions.

Section 6 of article I of our State Constitution provides, among other things: " The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law." In the Report of the Subcommittee on

Judicial Powers and Administration of the New York State Constitutional Convention Committee, of which then Chief Judge FREDERICK E. CRANE was Chairman (Vol. IX, p. 861 [1938]), we read: " It is undisputed that the grand jury is the only body authorized by law to conduct a general investigation into the commission of crime without a specific charge of crime and without the necessity for naming a specific defendant." (See, also, Code Crim. Pro., §§ 252, 223; *Ward Baking Co.* v. *Western Union Tel. Co.*, *supra*; *Matter of Both*, 200 App. Div. 423; *People ex rel. Travis* v. *Knott*, 204 App. Div. 379; *People ex rel. Sandman* v. *Tuthill*, 79 App. Div. 24; *People ex rel. Sampson* v. *Dunning*, 113 App. Div. 35; *Harriman* v. *Interstate Commerce Comm.*, 211 U. S. 407.)

The safeguards attending a grand jury investigation (Code Crim. Pro., part IV, tit. IV, ch. II, particularly §§ 223, 249, 255, 256, 265, 267) are not here preserved. The commission is empowered by executive order not only to investigate, but to " take action ". Any person may be freely interrogated, not only at private but at *public* hearings authorized by executive order, and said hearings may be conducted in such manner as the commission may elect. What is more compelling, so far as this record shows, the commission has not yet formulated and filed with the Department of State its rules for procedure, having contented itself with the issuance from time to time of oral announcements that are both vague and indefinite (N. Y. Const., art. IV, § 8).

To read subdivision 8 of section 62 as conferring power thus to investigate into the affairs of private individuals is to authorize an interference with constitutional due process contrary to all basic conceptions of law enforcement. Heretofore whenever subpœnas have been issued in violation of constitutional rights they have been vacated as they should be here (*People ex rel. Ferguson* v. *Reardon*, 197 N. Y. 236).

The broad and sweeping meaning now being attributed to subdivision 8 of section 62 overlooks the existing powers of the Governor to appoint extraordinary terms of the Supreme Court and to assign designated judges thereto, with special grand juries, as has frequently been done; and that a District Attorney of any county may be superseded or removed by the Governor whenever public interest requires it (N. Y. Const..

art. IX, § 5; Executive Law, § 62, subd. 2 [now § 63, subd. 2]; Judiciary Law, § 149).  There is nothing in the language of subdivision 8 of section 62 remotely suggesting that it was intended to supersede such constitutional and statutory procedures in the present situation.

We may note in passing that subdivision 8 of section 62 provides that "the expenses of the inquiry shall be made out of funds provided by the legislature for such purposes ", to be deposited in the names of the Governor and the Attorney-General, payable only on their draft and subject to no other audit, thus contemplating prior legislative authorization; there has been no such authorization here.  Moreover, while the statute directs the Attorney-General to make the appointments, the Governor, by his Executive Order, directly appoints the members of the commission, outlines their " duties, powers and authorities ", and then directs the Attorney-General to conduct the inquiry, coupled however with a request that he " do so by appointing the members of the commission ".  While the statute places upon the Attorney-General the responsibility of conducting the inquiry, the Executive Order provides: " The commission hereby established and the Attorney General *in cooperation* with the commission *are* hereby authorized and directed to exercise for the accomplishment of the purpose of this order all powers and authorities set forth in Section 62, Subdivision 8, of the Executive Law " (emphasis supplied). By the same Executive Order the commission is directed " to report on all of the foregoing to the Governor and the Legislature " — not to the Attorney-General.  It is true that the Attorney-General appoints each of the Governor's designees " an officer of the Department of Law " but then describes his office thus: "to wit: a member of a commission to be known as the New York State Crime Commission ", for which commission we all agree there is no statutory authority.  The oaths are taken in precisely the same manner.  Nor is there any authority to make the subpœnas here returnable " before " such commission " as directed by the Executive Order of the Governor ", or for the crime commission as such to issue them as they attempted to do here.  The foregoing merely serves to illustrate the great strain to which the respondents have been

put in their endeavor to bring themselves within a statute that could never have been intended as here applicable.

While we are mindful of the court's duty to construe statutes liberally, we do not lose sight of the rule that " freedom to construe is not freedom to amend " (*Sexauer & Lemke* v. *Burke & Sons Co.*, 228 N. Y. 341, 345; *Matter of O'Brien* v. *Tremaine*, 285 N. Y. 233; *Matter of McNerney* v. *City of Geneva*, 290 N. Y. 505; *Wagner* v. *Panama R. R. Co.*, 299 N. Y. 432; *Saltser & Weinsier, Inc.*, v. *McGoldrick*, 295 N. Y. 499).

We cannot agree with the interpretation now given to subdivision 8 of section 62 of the Executive Law, for reasons regarded as fundamental in the administration of justice under the law. We believe such interpretation to be a dangerous step in the absorption by the Executive Department of a judicial function without express legislative sanction.

The order appealed from should be reversed and the application to vacate the subpœnas should be granted.

LOUGHRAN, Ch. J., LEWIS and DESMOND, JJ., concur with CONWAY, J.; FULD, J., concurs in separate opinion; DYE, J., dissents in opinion in which FROESSEL, J., concurs.

Order affirmed.