Jones, J.
In these three cases we hold that the Deputy *412 Attorney-General had authority by the issuance of an office subpoena duces tecum under subdivision 8 of section 63 of the Executive Law to compel the production of books and records of private proprietary homes for adults.
On August 2, 1976 the Governor issued Executive Order No. 36 (9 NYCRR 3.36) directing the Attorney-General, or his deputy "to inquire into all matters concerning the administration, management, control, operation, supervision, funding and quality of private proprietary homes for adults, or any principal, operator, agent, supplier or other person connected therewith”. As predicates for this directive the. order recited that "the treatment and care of elderly citizens in private proprietary homes for adults, and the management and operation of such facilities are matters concerning the public peace, public safety and public justice of the State of New York; and * * * the compensation for that treatment and care is derived in part from public funds, and the State of New York is responsible for licensing and supervision of such facilities; and * * * there have been numerous allegations of violations of law and mistreatment of residents in such facilities; and * * * the New York State Board of Social Welfare has requested you to investigate and prosecute the alleged commission of indictable offenses relating to private proprietary homes for adults”. Thereafter the Attorney-General appointed Charles J. Hynes as his deputy to perform any and all functions and to exercise any and all powers conferred by Executive Order No. 36 in relation to private proprietary homes for adults, and Arthur Friedman was assigned to the office of the deputy as a Special Assistant Attorney-General.
Although two separate private proprietary homes for adults (PPHA) are involved in these cases, the fact patterns and the contentions with respect to each are virtually the same. The Deputy Attorney-General served office subpoenas duces tecum calling for the production of voluminous books and records of two PPHAs and of the corporate landlord of one of such homes. In each case there has been a motion to quash and a motion to compel compliance. Supreme Court sustained each of the three subpoenas and ordered compliance, denying the applications to quash. This disposition was affirmed at the Appellate Division.
Preliminarily it is appropriate to dispose of the Deputy Attorney-General’s claim that the challenges to office , subpoenas raised by the PPHAs were not timely made. The thrust of *413 the argument is that the recipient of an office subpoena who desires to challenge its validity should be required to initiate a motion to quash rather than to await the institution of proceedings to compel compliance and then for the first time to raise objection. We reject this argument. In our view the recipient may properly raise his objections when the official issuing the office subpoena first seeks judicial sanction for noncompliance. (Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, 256; see Matter of Sussman v New York State Organized Crime Task Force, 39 NY2d 227, 234.) Accordingly, we treat the objections to the office subpoenas in all three cases as timely made.
We turn then to the principal question presented by and argued on these appeals—whether the Deputy Attorney-General had authority under subdivision 8 of section 63 of the Executive Law to subpoena records of PPHAs and, in the Oceanaire case, of the landlord of a PPHA.
Subdivision 8 of section 63 of the Executive Law, which confers a power to subpoena witnesses, books and papers, provides: "Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice”. The predecessor statute (Executive Law, § 62, subd 8) was enacted during World War I, when the Legislature recognized that a war emergency might create a need for such authority to obtain information concerning sabotage—in effect a standby authority for circumstances in which there might not be time or opportunity for the normal functioning of the legislative process (L 1917, ch 595). After World War I, the authority was continued notwithstanding that the Attorney-General recommended repeal of the statute. Until today, however, there have been but three occasions in which our court has been asked to sustain investigations conducted under the authority of subdivision 8 of section 63 and its predecessor. In Matter of Di Brizzi (Proskauer) (303 NY 206), our court held that recourse to the section could be had to combat organized crime in government. In Matter of Greenspon v Stichman (12 NY2d 1079), we rejected a challenge to an investigation under the section of "the relationship between misconduct or corruption in office by public officials and the faithful execution of the laws by units of government in the State’’. Most recently we held that the section could be *414 read as including authority for the investigation of the nursing home industry (Matter of Sigety v Hynes, 38 NY2d 260). This latter holding was based on a combination of compelling factors: the State’s recognized responsibility for the care of the elderly, the quantum of financial support for such care that came from the public treasury, and the existence of widespread corruption in the industry. It was vigorously argued then, however, that authority for such investigation was not properly to be found in subdivision 8 of section 63.
It would seem evident that the course much to be preferred with respect to State-wide investigations of this sort would be the enactment of specific, ad hoc legislative authority for particular inquiries. Thereby need and scope of the inquiry could be determined by the elected representatives of the people, reflecting an informed, current evaluation of the circumstances (cf., e.g., Executive Law, § 70-a, State-wide Organized Crime Task Force).
We are now urged to conclude that, inasmuch as authority has been found in the section for investigation of the nursing home industry, authority should also be found for inquiry into private proprietary homes for adults. Similarities between these two areas of activity are evident. To a large extent the consumers of care and service come from the same sector of our State’s population. Historically the great bulk of financial support has and does come from the public treasury, formerly in direct grants to the homes, now in indirect but equally significant subsidy routed through the residents of the homes.* The operation of the homes is subject to the supervision of the State Board of Social Welfare (Executive Law, §§ 750, 751, 758; see Social Services Law, former §§ 21, 22, 35-a).
*415 In view of the particular complex of circumstances, and especially the close similarity to nursing homes, we conclude that authority may be found in subdivision 8 of section 63 for the inquiry the Attorney-General, as directed by the Governor, is conducting into the operations of private proprietary homes for adults. In reaching the conclusion we do in this case we should not be understood as viewing subdivision 8 of section 63 as any reservoir of latent authority for investigations, however desirable they may be thought to be, into other areas of legitimate governmental concern or responsibility. Quite the contrary. In perspective we perceive recourse to this section as having been intended only when for compelling reasons reliance cannot or should not necessarily be placed on specific, individualized grants of authority from the Legislature; initially it was even argued that it took a peril such as sabotage which threatened the very existence of the State to activate the authority of this section (Matter of Di Brizzi [Proskauer] 303 NY 206, 214, supra).
On a narrower focus, appellants assert that Executive Order No. 36 is ineffectual because the recited request had emanated from a Special Deputy Attorney-General rather than from the Attorney-General and because there had been no explicit recital of a factual determination on the part of the latter that "the public interest requires” the investigation of PPHAs. We conclude that there is no substance to either of these hypertechnical claims. Subdivision 8 of section 63 contemplates either of two initiatory procedures:—when the Attorney-General judges that the public interest requires it and the Governor approves, or (as here and in Matter of Sigety v Hynes, 38 NY2d 260, supra) when the Governor directs it. Surely the position of the Attorney-General, whether of request or concurrence, may effectively be manifested by his deputy.
By like token there is no substance to the claim that respondent failed to establish that the executive order was issued for the purpose of furnishing the Governor with information. The proof in the records in these cases gives rise to the unmistakable inference, implicitly found as a fact by both lower courts, that this was precisely the objective of the issuance of Executive Order No. 36. (Contrast Ward Baking Co. v Western Union Tel. Co., 205 App Div 723.)
We hold, therefore, that the Deputy Attorney-General had *416 authority, pursuant to Executive Order No. 36 and the provisions of subdivision 8 of section 63, to issue subpoenas duces tecum in aid of his inquiry into the affairs of PPHAs.
Appellants in the two PPHA cases contend further that, even if it be conceded that the Deputy Attorney-General had authority to issue subpoenas duces tecum, enforcement of these subpoenas would violate constitutional protections against compulsory self incrimination. The privilege against self incrimination reflects a policy of "protection of an individual’s right to a 'private enclave where he may lead a private life’ ” (Bellis v United States, 417 US 85, 91); the constitutional guarantee against compulsory self-disclosure, concerned primarily with protection of individual civil liberties, is not to be interpreted to insulate economic or other interests of organizations, incorporated and unincorporated, when to do so would be to frustrate appropriate governmental regulation (United States v White, 322 US 694, 700). The proposition that a PPHA is such a "private enclave” is negated beyond peradventure by the statutory command to the Board of Social Welfare to "visit and inspect, from time to time, and maintain a general supervision” of such homes (Executive Law, § 750, subd 1, par a); the grant of power to representatives of the board of "full access to the * * * books and papers relating to such institution” (Executive Law, § 750, subd 3); the authorization given to the board to "direct an investigation * * * of the affairs and management” of such a home (Executive Law, § 752); and the required compliance in operation of such a home with the rules of the board (Executive Law, § 758, subd 3, par [e]; cf. Davis v United States, 328 US 582). We rejected a similar claim in Matter of Sigety v Hynes (38 NY2d 260, 268, supra).
Finally appellants attack the subpoenas duces tecum in these cases as too sweeping in the extent of the books and records directed to be produced. Both courts below have found that the evidence sought is relevant and not overbroad in view of the purpose of the inquiry. We cannot say that such conclusions, involving as they do primarily factual determinations, were erroneous as a matter of law. There surely are limits to the reach of office subpoenas, and inquisitorial officers are not to be understood as licensed to embark on roving fishing expeditions (cf. Dunham v Ottinger, 243 NY 423, 433). It appears that such limits have been approached if not reached in these cases. We cannot, however, say they have *417 been exceeded here when it is recalled that the focus of the present inquiry is the "administration, management, control, operation, supervision, funding and quality of private proprietary homes for adults”, and it is recognized that an "[investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing to the stage of a preliminary contest as to the obligation of the writ” and "[o]nly where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold” (cf. Matter of Edge Ho Holding Corp., 256 NY 374, 381-382).
For the reasons stated the order of the Appellate Division in each case should be affirmed, with costs.

 By virtue of the State-wide program of additional State payments for aged, blind and disabled persons, established in order to maintain assistance for such persons at a level consistent with their needs (Social Services Law, § 207), persons living in private proprietary homes for adults, being part of the "receiving residential care” category, receive substantially more money per month than do those living alone in a private household, classified as "living alone” (Social Services Law, § 209, subd 3, pars [a], [d]; subd 2, pars [a], [d]). Because of the over 80 million dollars expended yearly in supplemental security income payments to 70% of the approximately 20,000 residents in 549 adult homes, of which the State pays a major portion, it is difficult to perceive the reality of appellants’ claims that PPHAs do not receive any compensation from public funds. It is true by way of some difference that public funds are paid directly to nursing homes by the State for the care of those patients entitled to Medicaid benefits, but residents at adult homes entitled to supplemental security income benefits receive public funds from the State specifically to pay for their care at such homes.