OPINION OF THE COURT
Michael J. Garson, J.
Petitioner[1] moves to quash a Grand Jury subpoena duces tecum served upon him as operator of "John Doe Home for Adults” on the following grounds: (a) the respondent Deputy Attorney-General does not have "jurisdiction” to investigate adult homes; (b) the letters authorizing the Attorney-General to investigate the private proprietary homes for adults (hereinafter referred to as PPHA) industry are stale; and (c) respondent’s office has become impermissibly independent from the Attorney-General’s office.
The court has considered petitioner’s moving papers and exhibits and respondent’s submissions in opposition in deciding this motion.
FACTS
On December 19, 1974, in separate letters, the Commissioners of the Department of Health and the Department of Social Services made written requests to the Attorney-General to investigate and if necessary prosecute offenses involving the *799 nursing home industry under section 63 (3) of the Executive Law.
In response to said requests, Attorney-General Lefkowitz appointed Charles J. Hynes on January 10, 1975 with respect to nursing home matters as "Deputy Attorney General [Special Prosecutor] with authority to perform as my Deputy any and all functions and to exercise any and all powers conferred upon the Attorney General”.
On February 7, 1975 Governor Hugh L. Carey issued Executive Order No. 4 (9 NYCRR 3.4) recommending to the Attorney-General that Hynes be appointed to exercise powers provided for by Executive Law § 63 (8) to investigate the nursing home industry (Matter of Di Brizzi [Proskauer], 303 NY 206). Hynes was then appointed by the Attorney-General to undertake the duties requested by the Governor. The letter appointing Hynes indicated that the appointment was terminable at will by the Attorney-General.
The New York State Board of Social Welfare (hereinafter referred to as the Board) made a written request on April 20, 1976, as per a resolution of the Board of the same date, asking the Attorney-General to investigate "any indictable offense or offenses * * * by private proprietary homes for adults * * * and principals, agents, suppliers and other persons connected or involved therewith”. The request was made pursuant to section 63 (3) of the Executive Law.
In a letter dated June 28, 1976 the Attorney-General once again assigned Hynes as his deputy to undertake such investigation and any prosecutions arising therefrom. According to the Attorney-General’s letter, the assignment was to "supplement the authority you received upon your appointment as my deputy on January 10, 1975 to perform all the functions and to exercise all the powers conferred upon the Attorney General”.
On August 2, 1976, Governor Carey issued Executive Order No. 36 (9 NYCRR 3.36) recommending to the Attorney-General that Hynes be appointed to conduct an inquiry into the PPHA industry pursuant to Executive Law § 63 (8). The Order directed Hynes to inquire into "all matters concerning the administration, management, control, operation, supervision, funding and quality of private proprietary homes for adults, or any principal, operator, agent, supplier or other person connected therewith”.
The Governor’s Executive Law § 63 (8) request was con *800 firmed by an August 26, 1976 letter of the Attorney-General and read, in pertinent part, as follows:
"You are hereby appointed as a Deputy Attorney General with authority to perform as my Deputy any and all functions and to exercise any and all powers conferred upon the Attorney General by Executive Order No. 36 * * * in relation to private proprietary homes for adults * * *
"This appointment is terminable by the Attorney General at will” (emphasis added).
Hynes’ duties were further enlarged in 1977 to include hospitals subject to the Public Health and Social Services Laws and again in 1978 to cover Medicaid matters.
In 1977, the State Legislature transferred the powers and duties of the Board of Social Welfare to the State’s Department of Social Services (see, L 1977, ch 669). The transferring legislation expressly provided for the perpetual continuation of the prior activities and actions of the Board. It provided in effect that all prior determinations and actions of the Board should continue in full force and effect under the auspices of the Department of Social Services.
Respondent was appointed by the Attorney-General to succeed Charles Hynes on December 17, 1980 as Deputy Attorney-General with "authority to perform any and all powers conferred upon me as Attorney General”. The letter from Attorney-General Abrams went on to provide:
"You are hereby authorized to exercise any and all rights, powers, responsibilities, duties and assignments previously imposed upon or delegated to former Deputy Attorney General Charles Hynes by me or my predecessor, and authorized to continue, in your own name, any proceedings, actions or other matters commenced by Mr. Hynes * * *
"Your tenure is terminable by the Attorney General at will” (emphasis added).
On January 14, 1993, two months prior to the issuance of the subpoena at issue herein, respondent was asked to investigate "possible criminal activity that may have occurred at [petitioner’s] adult home”. The written request was signed by Department of Social Services (DSS) Deputy Counsel Bridget Eadon, and was written upon DSS letterhead. The letterhead included the printed names of the Commissioner of Social Services and DSS General Counsel.
Several excerpts from various executive budgets have been submitted by petitioner in support of his motion to quash. *801 Recent budget pronoucements state that respondent’s office "was established in 1975 * * * by the Governor and the Attorney General to conduct a statewide investigation of and prosecute criminal activities in, nursing home and health industries”, and that "[i]n all other respects the Unit acts as an independent agency” (1992-1993 Executive Budget, at 388).
Also submitted are executive budgets from fiscal years covering 1978-1979 through 1984-1985 which make reference to ongoing adult home investigations, and budgets subsequent to 1984-1985 which make no such reference.
respondent’s authority to investigate ppha’s
Executive Law § 63 (3) reads, in pertinent part, as follows:
"The attorney-general shall: * * *
"3. Upon request of the governor, comptroller, secretary of state * * * or the head of any other department, authority, division or agency of the state, investigate the alleged commission of any indictable offense or offenses in violation of the law which the officer making the request is especially required to execute or in relation to any matters connected with such department, and to prosecute the person or persons believed to have committed the same and any crime or offense arising out of such investigation or prosecution or both, including but not limited to appearing before and presenting all such matters to a grand jury” (emphasis added).
Subdivision (8) of Executive Law § 63 reads, as is relevant, as follows: "8. Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice. For such purpose he may, in his discretion * * * appoint and employ, and at pleasure remove, such deputies, officers and other persons as he deems necessary, determine their duties and, with the approval of the governor, fix their compensation * * * The attorney-general, his deputy, or other officer, designated by him, is empowered to subpoena witnesses, compel their attendance, examine them under oath before himself or a magistrate and require that any books, records, documents or papers relevant or material to the inquiry be turned over to him for inspection, examination or audit, pursuant to the civil practice law and rules” (emphasis added).
The letter of April 20, 1976 from the Board of Social *802 Welfare to the Attorney-General empowered that office to undertake an investigation of the PPHA industry pursuant to Executive Law § 63 (3). The Attorney-General properly delegated the duties to Charles J. Hynes, who had already been assigned similar duties vis-á-vis the nursing home industry (Matter of Moe v Kuriansky, 120 AD2d 594, 595; see also, Matter of De Lucia v Lefkowitz, 62 AD2d 674, 678, affd sub nom. Matter of Hopkins v Lefkowitz, 48 NY2d 901; Executive Law § 62).
The subsequent resignation of Charles Hynes had no effect on the authority of the Attorney-General to continue the probe of the PPHA industry. A request under Executive Law § 63 (3) vests the Attorney-General with the authority to act pursuant to such a request and not the Special Prosecutor, although he may properly delegate the duties to his deputies. Respondent’s appointment to succeed Hynes clearly bestowed upon respondent all duties and powers lawfully possessed by Hynes through the Attorney-General and his predecessor. The Attorney-General, upon Hynes’ resignation, simply delegated the Special Prosecutor’s duties to respondent (Matter of Moe v Kuriansky, 120 AD2d, at 595, supra).
In addition to his authority under section 63 (3), the Attorney-General was also properly vested with the power to inquire into the PPHA industry via the Governor’s Executive Order No. 36, pursuant to Executive Law § 63 (8) (see, Matter of Friedman v Hi-Li Manor Home for Adults, 42 NY2d 408; Matter of Sigety v Hynes, 38 NY2d 260, 265; see also, 9 NYCRR 3.36). Here too, the duties conferred by the Executive Order upon the Attorney-General were properly delegated to Hynes by the Attorney-General, and then reassigned to respondent in 1980 (42 NY2d, at 415, supra; see also, Matter of Moe v Kuriansky, 120 AD2d, at 595, supra; Executive Law § 62). Since the authority to investigate the PPHA industry under both subdivisions (3) and (8) of Executive Law § 62 was bestowed upon the Attorney-General and not upon the Special Prosecutor, the resignation of Hynes and the appointment of Kuriansky to continue Hynes’ duties had no effect upon the "jurisdiction” of the Special Prosecutor’s office to investigate PPHA’s.
If there was any doubt as to respondent’s continuing authority to investigate PPHA’s pursuant to the request of the Board of Social Welfare (Executive Law § 63 [3]) or pursuant to Executive Order No. 36 of the Governor (9 NYCRR 3.36), the *803 1993 written request of the Department of Social Services has revived such authority.
That the request to investigate was signed by a Deputy Counsel rather than the "head” of the department is of no moment. Deputy Counsel properly acted as an agent/attorney for the Commissioner of Social Services in making the section 63 (3) request and such act is binding upon the Commissioner of Social Services (see, People v Cassas, 194 AD2d 685; see also, Shaft v Phoenix Mut. Life Ins. Co., 67 NY 544).
In the absence of a mandated form in the Executive Law § 63 (3) requests, a request by a Deputy Counsel is sufficient (see, People v Liebowitz, 112 AD2d 383, 384, lv denied 65 NY2d 928), particularly where counsel’s authority to act is assumed in the absence of an objection by the client (see, e.g., Hookey v Greenstein, 119 App Div 209, 211; Bismarck v Incorporated Vil. of Bayville, 40 Misc 2d 1082, 1084, affd 21 AD2d 797).
Thus, the request by DSS Deputy Counsel on behalf of the Commissioner of Social Services to investigate petitioner’s adult home was in accord with the requirements of Executive Law § 63 (3), which "should not be construed strictly, but, rather, should be read in 'a sense to accomplish the purpose intended’ [citation omitted]” (Matter of Mann Judd Landau v Hynes, 49 NY2d 128, 135).
Petitioner’s motion to quash the subpoena duces tecum on the ground that respondent no longer has the authority or "jurisdiction” to investigate PPHA’s is denied.[2]
STALENESS
Petitioner asserts that the letters authorizing the Attorney-General to investigate the PPHA industry are stale, claiming that Executive Law § 63 (3) does not grant "perpetual authority to investigate PPHA’s” and that PPHA investigations by respondent’s office have ceased.
The authority of the Attorney-General to act pursuant to sections 63 (3) and 63 (8) of the Executive Law has been firmly *804 established (Matter of Mann Judd Landau v Hynes, 49 NY2d 128, supra; Matter of Friedman v Hi-Li Manor Home for Adults, 42 NY2d 408, supra; Matter of Sigety v Hynes, 38 NY2d 260, supra; Matter of Agnello v Armer, 56 AD2d 712; Matter of L & S Hosp. & Inst. Supplies v Lefkowitz, 54 AD2d 734; Matter of L & S Hosp. & Inst. Supplies Co. v Hynes, 51 AD2d 515, affg 84 Misc 2d 431, lv denied 38 NY2d 710).
This court is unaware of any authority for the proposition that the mere passage of time renders illegal or improper the continued exercise of an authority duly delegated pursuant to Executive Law § 63 (3) and/or (8). In Matter of Di Brizzi (303 NY 206, 210, supra), petitioner challenged the continued efficacy of an Executive Order by the Governor directing the Attorney-General to establish the "New York State Crime Commission”. It was claimed that the statute enabling the Governor to authorize the Attorney-General to act had been enacted over 34 years earlier as an emergency World War I measure. The emergency having ended, it was claimed that the authorization was no longer valid. The Court remarked (at 214): "There is little doubt, of course, that the Legislature first recognized the need for such a statute as this because of a war emergency. The Legislature, in enacting the statute, however, utilized general terms, and did not, either expressly or by implication, limit its operation to a time of war. We may not do so now.”
The letters authorizing the investigation into the PPHA industry in the case at bar do not expressly or impliedly limit the investigatory request to any specific time period and, in the absence of such limiting language, this court may not do so. Indeed the Appellate Division has specifically rejected petitioner’s argument that under Executive Law § 63 (3) the Attorney-General is limited to short-term investigations (Matter of Moe v Kuriansky, 120 AD2d, at 595, supra).
In addition, in Di Brizzi (supra), the Court recognized that while the catalyst for the creation of the statute was World War I, the reason for the creation of the "New York State Crime Commission” continued unabated (Matter of Di Brizzi [Proskauer], 303 NY 206, supra). Notwithstanding petitioner’s contention that PPHA investigations have ceased, this court finds that the reasons existing for PPHA investigations in 1976 continue to exist today. Petitioner’s contentions are belied by respondent’s submissions which detail, from her personal knowledge, significant activities of his office regarding PPHA investigations from 1988 to the present.
*805 The impetus for the investigation of the PPHA industry in 1976, as outlined in Friedman v Hi-Li Manor (42 NY2d 408, 414, supra), continues to exist today. The "State’s recognized responsibility for the care of the elderly, the quantum of financial support for such care that came from the public treasury, and the existence of wide-spread corruption in the industry” (supra) has not changed.
That the State Legislature transferred the powers and duties of the Board of Social Welfare to the State’s Department of Social Services does not effect the vitality of the authorization letters. The legislation provided as follows: "All rules, regulations, determinations and decisions of the state board of social welfare pertaining to the functions herein transferred and assigned in force at the time of such transfer and assignment shall continue in force and effect as rules, regulations, determinations and decisions of the state department of social services. Whenever the term 'board’ or 'state board of social welfare’ are referred to or indicated in any contract or document pertaining to the functions, powers and duties hereby transferred and assigned, such reference or designation shall be deemed to refer to the state department of social services” (L 1977, ch 669, § 24).
By this legislation, the Legislature intended that the actions of the Board be transferred untainted and uninterrupted. Where the words of a statute are "clear and unambiguous the court is constrained to give effect to the plain meaning of a statute’s words” (People v Floyd J, 61 NY2d 895, 896; McKinney’s Cons Laws of NY, Book 1, Statutes § 76). To hold that the Board’s section 63 (3) request dissipated with the integration of the Board into the Department of Social Services would fly in the face of the legislative enactment’s plain meaning.
Thus, the Attorney-General’s authority, derived from the Board’s Executive Law §63 (3) request, remains in effect unless specifically terminated or rescinded (see, Matter of Moritt v Nadjari, 51 AD2d 754, lv denied 38 NY2d 711).
For the same reasons set forth above concerning the Board’s section 63 (3) request, the Governor’s Executive Order No. 36 is not stale. Moreover, the letter of January 14, 1993 from DSS Deputy Counsel properly authorized the current investigation and is clearly not stale.
INDEPENDENCE FROM THE ATTORNEY-GENERAL’S OFFICE
Petitioner alleges that respondent has improperly and un *806 lawfully been delegated powers reserved to the Attorney-General and that Executive Law § 63 (3) does not permit the delegation of authority to an independent agency or official.
The governmental power to create and act through various agencies has been firmly established (see, e.g., Matter of Levine v Whalen, 39 NY2d 510, 515). Such agencies may be created by the State Legislature (see, e.g., Matter of Metropolitan Life Ins. Co. v New York State Labor Relations Bd., 280 NY 194; see also, Szold v Outlet Embroidery Supply Co., 274 NY 271, appeal dismissed 303 US 623; Barrencotto v Cocker Saw Co., 266 NY 139), the legislative bodies of cities (Matter of Molnar v Curtin, 273 App Div 322, affd 297 NY 967) or by the Executive Branch (Matter of Di Brizzi [Proskauer] 199 Misc 670, affd 278 App Div 913, affd 303 NY 206, supra). Although the New York State Constitution prohibits the creation of more than 20 "civil departments” of State government (People v Tremaine, 252 NY 27, 50; NY Const, art V, § 2),[3] the Legislature may create "temporary commissions for special purposes” (NY Const, art V, § 3).
The Medicaid Fraud Control Unit was not created by legislative enactment where such an agency would be limited to "powers expressly conferred by its authorizing statute, as well as those required by necessary implication”. (Matter of City of New York v State of N Y. Commn. on Cable Tel., 47 NY2d 89, 92; see also, People v Cardillo, 80 AD2d 952.) Nor is it one of the 20 "civil departments” originally enumerated by the State Constitution (see, People v Tremaine, 252 NY, at 50, supra; NY Const, art V, § 2). The Unit was established via the delegation of specific duties to it by the Attorney-General.
Moreover, the "heads” of all "departments”, except as otherwise provided in the Constitution (i.e., a temporary commission for special purposes created by the Legislature), are appointed by the Governor with the advice and consent of the Senate and may be removed by the Governor in the manner prescribed by law (see, 2 NY Jur 2d, Administrative Law, § 20, at 33; NY Const, art V, § 4). In contrast, in the matter at bar, respondent was appointed by the Attorney-General and delegated the duty to investigate PPHA’s pursuant to powers conferred upon the Attorney-General by Executive Law § 63 *807 (3) and (8) (Matter of Moe v Kuriansky, 120 AD2d, at 595, supra), and the power to terminate the respondent has been reserved by the Attorney-General and not the Governor, as is the case with separate departments of State government.
Executive Law § 62 authorizes the Attorney-General to appoint deputies, assistants and any other attorney he deems necessary (see, Matter of De Lucia v Lefkowitz, 62 AD2d 674, 678, supra). It is clear that many duties of the Attorney-General are delegable to his assistants (supra, at 679). For example, the Attorney-General may delegate the authority to issue office subpoenas (Matter of Friedman v Hi-Li Manor Home for Adults, 42 NY2d 408, supra) or the authority to issue Grand Jury subpoenas or appear before such Grand Juries (Matter of L & S Hosp. & Inst. Supplies Co. v Hynes, 51 AD2d 515, supra).
While the Attorney-General may delegate certain duties to his assistants, he may not transfer the fundamental responsibilities of his office to them (see, Matter of Schumer v Holtzman, 60 NY2d 46, 53).
In Schumer (supra), the District Attorney appointed a Special Prosecutor to investigate Congressman Charles Schumer. The Appellate Division, relying on the four corners of the District Attorney’s memorandum appointing the Special Prosecutor, found that the District Attorney improperly surrendered powers that are reserved to her, and gave the Special Prosecutor virtual independence from supervision (Matter of Schumer v Holtzman, 94 AD2d 516, 528). The Court of Appeals held that the appointment manifestly attempted to "divest respondent Holtzman of her discretionary judgment to initiate, pursue and conclude investigations and prosecutions” (Matter of Schumer v Holtzman, 60 NY2d, at 53, supra). Nothing submitted by the petitioner indicates that the Attorney-General has abdicated his responsibility to supervise respondent’s office.
The characterizations of the Unit by the budget statements as a "separate unit” or a "miscellaneous unit” do not alter respondent’s status as a duly appointed Deputy Attorney-General possessing only those powers specifically delegated to him by the Attorney-General. The letters delegating the duty to investigate PPHA’s to Hynes and to Kuriansky in no way purported to limit the Attorney-General’s power to "ultimately control the unit’s work” (Matter of Moe v Kuriansky, 120 AD2d, at 595, supra).
*808 That respondent regularly exercises his independent judgment in matters handled by the Unit does not change his status as a deputy answerable to the Attorney-General. As stated in Matter of De Lucia v Lefkowitz (62 AD2d, at 679, supra): "every Assistant Attorney-General acts as surrogate for the Attorney-General when called upon to take a position in court, to appear for any agency of government or to litigate or dispose of any legal matter. The Assistant Attorney-General performs his duties in the name of and on behalf of the Attorney-General. He or she acts independently when making legal decisions or in deciding matters of policy” (emphasis added).
This court holds that so long as the Attorney-General retains the right to hire or fire the Special Prosecutor, and the right to overrule any decisions of the Special Prosecutor, he has not created a new office or transferred fundamental duties to another. It is irrelevant that the Attorney-General does not exercise these rights, so long as he retains these rights (see, e.g., State ex rel. Walton v Crabbe, 109 Ohio St 623, 627, 143 NE 189, 191). The fact that upon the resignation of Hynes in 1980 the Attorney-General appointed respondent to succeed him manifests an exercise of his power.
In United States v Nixon (418 US 683), the United States Attorney General delegated to the Special Prosecutor plenary authority to investigate and prosecute the President of the United States (supra, at 694, n 8), but retained the right "to amend or revoke” his authority (supra, at 696). Similarly, in Accardi v Shaughnessy (347 US 260), the Attorney General of the United States delegated all of his discretionary powers to the Board of Immigration but reserved the right to revoke that authority. That in neither matter did the Attorney General exercise the right to revoke or amend the delegee’s powers is not dispositive. It is the right to hire or fire, and the right to overrule the decisions of subordinates that enables the Attorney General to maintain control over them (see, Steinman v Nadjari, 49 AD2d 456; Zimmerman v City of New York, 52 Misc 2d 797, 801; Powers v Hauck, 399 F2d 322). Nothing submitted by the petitioner indicates that the Attorney-General has relinquished his right to hire or fire the Special Prosecutor or effected his right to overrule the decisions of the Special Prosecutor. In the absence of such evidence, petitioner’s argument that respondent has become impermissibly independent must be rejected.
A subpoena duces tecum issued in connection with a Grand *809 Jury investigation of an adult home is presumed to be valid and the burden is upon the party seeking to quash such subpoena to demonstrate its invalidity (Matter of Doe v Kuriansky, 59 NY2d 836, 837, affg on opn 91 AD2d 1068, citing Virag v Hynes, 54 NY2d 437). Petitioner has failed to sustain his burden in the case at bar.
Petitioner’s motion to quash is denied. Petitioner is directed to comply with the subpoena within 10 days of service upon it of a copy of this decision and order.

. The identity of the petitioner is being kept confidential for the purposes of this motion.

. Petitioner’s argument that respondent’s office does not have the power to investigate PPHA’s because they do not receive Medicaid reimbursement is totally without merit. Respondent’s power to investigate Medicaid fraud supplemented the duties already bestowed upon him by the Attorney-General and was designed to take advantage of a Federal statute providing reimbursement for funds expended to establish and thereafter operate a Medicaid Fraud Control office.

. Although "civil department” is not defined in the Constitution, it has been defined by one court as " 'one of the separate divisions or branches of state or municipal administration’ ” (see, Matter of McLaughlin, 124 Misc 766, 771; 2 NY Jur 2d, Administrative Law, § 9, at 22).