OPINION OF THE COURT
Chief Judge Breitel.
Defendants, the Governor and the State Board of Public Disclosure, appeal from the Appellate Division’s unanimous affirmance of an order granting summary judgment to plaintiffs, State employees, and declaring the Governor’s Executive Order No. 10.1 (9 NYCRR 3.10) unconstitutional. The disputed order purports to require a wide range of State employees within the executive branch to file multidetailed personal financial statements with the Board of Public Disclosure, and to abstain from various political and business activities.
The issue is whether under the State Constitution the Governor may, by executive order, without benefit of authorizing legislation, mandate on State employees, many not subject to removal by the Governor, the filing of financial disclosure statements, and the abstention from activities not prohibited by statute. Not at issue is the wisdom of requiring such statements and prohibiting the proscribed activities, or the hardly doubted power to impose such requirements by appropriate legislation.
There should be an affirmance. Neither in the Constitution nor in the statutes is there express or implied authority for the Governor to exact of State employees compliance with the requirements of Executive Order No. 10.1. Nor does the Governor’s order merely implement existing legislation relating to conflicts of interest. The order reaches beyond that, and assumes the power of the Legislature to set State policy in an area of concededly increasing public concern.
The executive order was promulgated by the Governor on October 22, 1976.* Paragraph II, which requires annual filing of a financial disclosure statement, prohibits service in political party office, and regulates outside employment and activity, applies to the following employees: (1) employees of the executive department and other State departments and agencies headed by gubernatorial appointees or nominees (a) whose annual State salary is at least $30,000; or (b) who hold nonsecretarial, nonclerical positions classified as managerial or confidential; and (2) members of the governing bodies of *161 State entities, if the member is appointed or nominated by the Governor and receives more than $15,000 per year in compensation from the State. Paragraph III, which also requires filing of a financial disclosure statement, but does not contain the same prohibitions on outside activity, applies to members of governing bodies of State entities, if the member is appointed by the Governor and receives State compensation which amounts to no more than $15,000. The State Board of Public Disclosure, first established by the Governor in Executive Order No. 10 (9 NYCRR 3.10), an earlier more limited attempt to regulate potential conflicts of interest, was continued to administer the new executive order.
The agencies purportedly covered by the executive order are not confined to the executive department, a department that is but one of many in the executive branch. It also extends to other State departments and many so-called independent agencies, such as public authorities, over which the Governor had no general control or powers of supervision or operation.
On November 1, 1976, the State board directed covered employees to complete financial disclosure statements and return them to the board by December 1. This action was brought by covered employees to have the order declared unconstitutional and to enjoin its enforcement. Special Term granted the requested relief, and a unanimous Appellate Division affirmed.
Not at issue is the constitutionality of a statute requiring financial disclosure by public employees and officers. It was implied, necessarily, that a statute to that effect would be valid in Evans v Carey (40 NY2d 1008, affg 53 AD2d 109; see, also, Hunter v City of New York, 44 NY2d 708, decided simultaneously with this case, affg on opn at 58 AD2d 136). In Evans, however, although, as here, an executive order was involved, no contention was made that a statute, rather than an executive order, was necessary to compel the desired financial disclosure or prohibit the described activities. Plaintiffs in Evans instead argued that financial disclosure could not be required of public employees at all.
In Hunter v City of New York (58 AD2d 136, 140-141, affd 44 NY2d 708, supra), Mr. Justice Birns provides a framework for evaluating contentions that financial disclosure requirements intrude on an asserted right of privacy. The issue is actually one of due process of law, since privacy is but a subcategory of liberty, which may not be denied without due *162 process. The test, then, is whether there has been " 'protection of the individual against arbitrary action’ ” (58 AD2d, p 141, quoting Ohio Bell Tel. Co. v Commission, 301 US 292, 302 [Cardozo, J.]). This issue of privacy, if that it be deemed, was and is determined by the Evans case and the Hunter case, decided simultaneously with this.
The executive power of the State, vested in the Governor, is broad (see NY Const, art IV, §§ 1, 3; Executive Law, arts 2, 3). In his capacity to oversee, even beyond his responsibility to operate, the Governor may investigate the management and affairs of any department, board, bureau, or commission of the State (Executive Law, § 6). This investigatory power, which includes the power to subpoena witnesses, as well as to require the production of books and papers, and which authorizes the Governor to delegate the investigatory function to persons appointed by him for that purpose, permits the Governor to exercise considerable vigilance, but not necessarily direction, in protecting against conflicts of interest. The Constitution and statutes thus recognize explicitly the need for and the power in the Governor to oversee, but again not necessarily to direct, the administration of the various entities in the executive branch.
The Governor may also direct the Attorney-General to inquire into matters "concerning the public peace, public safety and public justice” (Executive Law, § 63, subd 8). Implementation of this power is illustrated by Governor Dewey’s creation in 1951 of the New York State Crime Commission to investigate the relationship between organized crime and State government (see Matter of Di Brizzi [Proskauer], 303 NY 206, 211-216).
There are, however, limits to the breadth of executive power. The State Constitution provides for a distribution of powers among the three branches of government (see NY Const, art III, § 1; art IV, § 1; art VI). This distribution avoids excessive concentration of power in any one branch or in any one person. Where power is delegated to one person, the power is always guided and limited by standards. In fact, even the Legislature is powerless to delegate the legislative function unless it provides adequate standards (Packer Coll. Inst. v University of State of N. Y., 298 NY 184, 189). Without such standards there is no government of law, but only government by men left to set their own standards, with resultant authoritarian possibilities.
*163 Defendants cite numerous instances, reaching far back into the State’s history, in which the Governor has acted by "executive order”, although not usually so denominated. But, until 1950, none of those orders had any rule-making component. They were emergency measures later submitted to the Legislature for ratification, actions taken pursuant to an unchallenged constitutional or statutory power of the Governor, or proclamations without significant legal effect. (See, e.g., 3 Lincoln, Messages from the Governor, pp 38-40 [proclamation calling Legislature into Extraordinary Session].) After 1950, there were a number of different types of orders which were seemingly cast in a rule-making mold, but were repetitive of existing legislation as to standards and implemented the enforcement of those standards by voluntary arrangements, directions for co-ordination, or the interposition of mediatory bodies (see, e.g., Executive Order Establishing Code of Fair Practices, 1960 Public Papers of Governor Nelson A. Rockefeller, p 1130; Executive Order for Resolution of Employee Complaints, 1950 Public Papers of Governor Thomas E. Dewey, p 613). Assuming they were valid, as they undoubtedly were in large measure, the order in this case goes beyond any of them.
It is true that in this State the executive has the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement (see NY Const, art IV, § 3). But he may not, as was recently said of the Mayor of the City of New York, "go beyond stated legislative policy and prescribe a remedial device not embraced by the policy” (Matter of Broidrick v Lindsay, 39 NY2d 641, 645-646). And, as noted in the Broidrick case, decided unanimously by this court, the flexibility allowed the executive in designing an enforcement mechanism depends upon the nature of the problem to be solved (id., p 646). Where it would be practicable for the Legislature itself to set precise standards, the executive’s flexibility is and should be quite limited.
Defendants seek to justify the executive order as an implementation of section 74 of the Public Officers Law. That statute, called a code of ethics for State officers and employees, provides guidelines designed to eliminate substantial conflicts of interest between State duties and private interests. Together with section 73 of the Public Officers Law, which, as opposed to guidelines, contains absolute rules and proscrip *164 tions, section 74 constitutes the legislative policy of the State in the conflict of interest area.
Crucial is the contrast between sections 73 and 74, enacted together in 1954 (L 1954, chs 695, 696). In section 73 the Legislature enacted a blanket prohibition of conduct by State employees thought to be detrimental to State interests. The prohibited conduct and the employees to which each prohibition applies are carefully described. In addition, subdivision 6 of the statute mandates public disclosure of a circumscribed category of investments by certain State employees and officers. Thus, in section 73 the Legislature demonstrated its ability and readiness to proscribe specified transactions peculiarly vulnerable to conflicts of interest, transactions in "definable areas on which there should be no disagreement” (Governor’s Memorandum on Approval, 1954 Public Papers of Governor Thomas E. Dewey, pp 304, 305).
Section 74 is a different type of statute. Designed to cover "areas where distinctions are close, and the differences between right and wrong not always easily ascertainable, [it] establishes] broad standards of conduct, leaving to advisory committees the process of developing a body of rules and precedents on the basis of continuing experience and trial and error” (id.).
As Mr. Justice Harold J. Hughes succinctly stated at Special Term in holding the executive order invalid, first quoting from the declaration of legislative intent accompanying enactment of section 74 (L 1954, ch 696, § 1), " 'Government is and should be representative of all the people who elect it, and some conflict of interest is inherent in any representative form of government. Some conflicts of material interests which are improper for public officials may be prohibited by legislation. Others may arisé in so many different forms and under such a variety of circumstances, that it would be unwise and unjust to proscribe them by statute with inflexible and penal sanctions which would limit public service to the very wealthy or the very poor. For matters of such complexity and close distinctions, the legislature finds that a code of ethics is desirable to set forth for the guidance of state officers and employees the general standards of conduct to be reasonably expected of them’ * * * [t]he inflexible proscriptions of the Executive Order are clearly at variance with this declaration of legislative intent” (Rapp v Carey, 88 Misc 2d 428, 431). In short, this order is not an *165 implementation of section 74; it is a nullification of it — a nullification, however benevolent in purpose, without benefit of legislative action.
The challenged order presumes to prohibit service in political party office by all State employees covered by paragraph II, not just by the small group of officials of high rank named in subdivision 8 of section 73 of the Public Officers Law. The order, again without any apparent statutory authority, would also prohibit, except on permission of the Board of Public Disclosure, all types of privately compensated employment by State employees. That the dual loyalties engendered by this dual employment may rightly be condemned is not the issue. The crux of the matter is the determination by the Legislature, implicit in its enactment of the code of ethics, that the existence of conflicts in these areas is to be determined on a case-by-case basis, not by use of blanket prohibitions.
None of this is to say that the Governor may not require that his appointees, serving at his will, abstain from transactions or business associations that potentially conflict with State duties. The Governor is, of course, free to regulate the business activities of employees serving at his pleasure. The same cannot be said, however, of employees who have civil service tenure, or even gubernatorial appointees who serve for fixed terms. These employees may not be removable except for cause, and are thus not subject to summary dismissal by the Governor. The challenged executive order exceeds the Governor’s power of appointment and reaches employees who could be neither directly appointed nor summarily dismissed by the Governor. As to these employees, the Governor is without power to impose the strictures contained in the executive order.
The restriction on political activities is particularly troublesome. While the restriction on the merits would be supported by many or even most, it involves a broad question of policy, hardly resolvable by other than the representatively elected lawmaking branch of government, the Legislature.
The out-of-State cases relied upon by defendants are not on point. True, in Illinois State Employees Assn. v Walker (57 Ill 2d 512, cert den sub nom. Troopers Lodge No. 41 v Walker, 419 US 1058), the Illinois Supreme Court upheld the Governor’s power to issue an executive order requiring financial disclosure statements. But that holding rested squarely on the Illinois Constitution which provided that all "holders of state *166 offices and all members of a Commission or Board created by this Constitution shall file a verified statement of their economic interests, as provided by law” (111 Const, art XIII, § 2, quoted in 57 111 2d, p 518). No similar provision may be found in the Constitution or statutes of this State.
Shapp v Butera (22 Pa Commw Ct 229) involved the status under the Pennsylvania "Right to Know Act” of financial disclosure statements filed pursuant to an executive order issued by the Governor. The Commonwealth Court of Pennsylvania, in concluding that the statements filed were not subject to public examination, inspection, and copying, noted that "[t]he financial statements requested by the Governor had no more legal effect than a request by the Governor to have birthday greetings sent to him” (id., p 237). By contrast, the present executive order was designed to be mandatory, not merely an invitation to voluntary compliance.
In Opinion of Justices (— NH —, 360 A2d 116) the New Hampshire Supreme Court sustained a resolution adopted by the Governor and council to the extent that the resolution stated a policy prohibiting employment of elective officials in the executive branch, but struck down provisions restricting the right of elective officials to do business with the State. The court concluded "[hjowever desirable comprehensive legislation in the area of conflict of interest may be, the enactment of such legislation is the prerogative and responsibility of the legislature and not of the executive” ( — NH —, —, 360 A2d, p 122).
The sister State cases, therefore, present problems different from the ones created by the instant executive order. Moreover, they do not and could not bear significantly on the issue in this case, arising as it does under this State’s particular constitutional and statutory provisions. The sister State cases are useful principally to show how other States have reacted to the use of executive orders in the conflict of interest area, and as such, they are either inconclusive, or largely supportive of the general principles here discussed.
The crux of the case is the principle that the Governor has only those powers delegated to him by the Constitution and the statutes. On the principle, there is general agreement (see, e.g., Shapp v Butera, 22 Pa Commw Ct 229, supra; Opinion of Justices, — NH —, 360 A2d 116, 122, supra; cf. Illinois State Employees Assn. v Walker, 57 Ill 2d 512, 518, supra). There should be no less agreement on application of the principle to *167 the facts of this case. On no reasonable reading of the Constitution, the Executive Law, or the relevant provisions of the Public Officers Law can the Governor’s exercise of legislative power, exemplified in the executive order, be sustained.
Under our system of distribution of powers with checks and balances, the purposes of the executive order however desirable, may be achieved only through proper means. No single branch of government may assume a power, especially if assumption of that power might erode the genius of that system. The erosion need not be great. "Rather should we be alive to the imperceptible but gradual increase in the assumption of power properly belonging to another department” (People v Tremaine, 252 NY 27, 57 [concurring opn per Crane, J.]).
Finally, it is quite significant that in the Hunter case (supra) in which this court has sustained, in large part, the validity of the local law, the City Council of the City of New York enacted, as a legislative matter, the financial disclosure requirements imposed on city employees. The Governor’s objective may be achieved by obtaining the requisite legislation. Critical, however, is that any difficulty or even impossibility of obtaining legislation through the constitutionally prescribed mechanisms may not be made a source of executive lawmaking power where none otherwise exists.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

 The complete order is set forth in an appendix.